ON MOTIONS FOR REHEARING AND/OR CERTIFICATION
 

 RAMIREZ, C.J.
 

 The appellants have moved for rehearing and/or certification, and the appellee has moved for rehearing. Upon consideration of these motions, we grant the appellants’ motion for rehearing and deny their motion for certification. Furthermore, we deny the appellee’s motion for rehearing, and we vacate our opinion of December 16, 2009, and issue the following opinion in its stead.
 

 The appellants are the plaintiffs who appeal the trial court’s final judgments and amended final judgments rendered upon disposition of the parties’ post-trial motions, including the plaintiffs’ motion for additur, the plaintiffs’ motion to set aside verdict on comparative negligence defense and for entry of judgment in accordance with the plaintiffs’ motion for directed verdict on said defenses, the plaintiffs’ motion to set aside portion of seven verdicts reduced by statute of limitations defense and for entry of judgment in accordance with the plaintiffs’ motion for directed verdict on said defense, and the plaintiffs’ motion for award of prejudgment interest.
 
 [1]
 

 
 *980
 
 Case numbers 8D07-1036 and 3D07-2322 are appeals from the final money judgments and the amended final money judgments entered in favor of certain plaintiffs. Case number 3D07-2318 is an appeal from judgments entered in favor of the defendant E.I. Du Pont de Nemours & Co. and against certain plaintiffs, based on statute of limitations defenses raised by Du Pont. In addition, Du Pont cross-appeals these judgments. We reverse and remand for new separate trials because the trial court erred in ordering a single, consolidated trial of the claims raised by all twenty-seven plaintiffs.
 

 I.
 
 Factual Background
 

 This action involves the mass, consolidated tort cases commenced in 2001 by twenty-seven Costa Rican growers of leatherleaf ferns against Du Pont, alleging product liability caused by Benlate, a systemic fungicide that Du Pont manufactured and marketed. The plaintiffs challenge the trial court’s decision to submit Du Pont’s statute of limitations defense to the jury; the trial court’s decision to deny pre-judgment interest under Florida law or indexation under Costa Rican law to the damages awarded by the jury; as well as the trial court’s directed verdict against seven plaintiffs, on statute of limitations grounds.
 
 [2]
 
 The plaintiffs further allege that the trial court abused its discretion in denying an additur for the plaintiffs’ remediation cost and related lost profits. Du Pont cross-appeals the trial court’s decision to consolidate the twenty-seven cases, as well as the entry of judgment against it for the remaining twenty plaintiffs. Du Pont further appeals on the grounds that the trial court repeatedly abused its discretion and committed reversible .error.
 

 Leatherleaf fern is an ornamental crop, a brightly colored and symmetrically shaped fern that florists use to enhance cut flower arrangements. The plaintiffs are commercial growers of leatherleaf fern in Costa Rica who grow the ferns for a worldwide market, providing ferns mostly for Europe and Japan. The leatherleaf fern is grown from an underground, root-like stem system called a rhizome. After a rhizome is planted, leatherleaf fern fronds grow from it and are harvested every six to eight weeks. The harvesting process involves cutting the fern foliage or fronds from the rhizomes, which remain in the ground. This process is repeated, subsequent fern crops grow in, and the new fronds are likewise harvested. Each rhizome continues to produce successive generations of leatherleaf fern for years, usually decades. During harvesting, the fronds are sorted manually to select out any malformed or discolored fern, and the good fern is sold for distribution to florists. Ferns are propagated using a vegetative reproduction method whereby the rhizomes are divided and planted to establish new fern crops.
 

 A. Du Pont’s Benlate Fungicide
 

 Du Pont’s agricultural business develops insecticides, herbicides and fungicides for the worldwide market. These products
 
 *981
 
 are promulgated for the protection of crops from pests and disease. In 1970, Du Pont introduced the first “systemic” fungicide under its brand name Benlate WP (“Wettable Powder”), containing the active ingredient benomyl. Benlate WP became the world’s leading fungicide, used in more than one-hundred countries in a wide variety of crops. Systemic fungicides are differentiated from conventional fungicides in that while conventional fungicides act outside of the plant, a systemic fungicide is absorbed into the plant and thus protects and cures crops by acting from within the plant.
 

 In 1987, Du Pont reformulated the Ben-late product, introducing Benlate DF (“Dry Flowable”), a dust-free formulation, which like Benlate WP, also contained be-nomyl as its active ingredient. Consequently, Benlate DF supplanted Benlate WP as the leading fungicide.
 

 B. The Trial
 

 Plaintiff Agrofollajes and the other twenty-six plaintiffs filed their 2001 claims seven months apart in two complaints that contained similar extensive, detailed allegations of plant damage. The Super He-léchos complaint was 88 pages long and contained 187 paragraphs of allegations, and the Euro Flores complaint was 37 pages long and contained 174 paragraphs of allegations. The complaints alleged that the plaintiffs’ leatherleaf fern plants were damaged by Du Pont because: (1) the Benlate was cross-contaminated with other chemicals that were manufactured at the same facility, and (2) Benlate DF broke down into DBU, a herbicide-like agent called dibutylurea (DBU), which was toxic and caused the plant damage.
 

 The plaintiffs represented to the trial court that consolidation would be more efficient because there were “many common issues” between the claims. Conversely, Du Pont alleged substantial differences in the plaintiffs’ Benlate use, farm management, growing conditions, growing practices, chemical uses, periods in which deformities materialized, plant disease problems experienced, and damage claims. Du Pont also proffered different alternative causes for the plant damages at the various ferneries. Du Pont proposed that the court schedule either one fernery or one group of ferneries, under common management, as individual plaintiffs in separate trials. The trial court ordered a single, consolidated trial of the claims by all twenty-seven plaintiffs. Du Pont timely filed an objection to the consolidated trial as well as motions to sever.
 

 At trial, however, the plaintiffs’ opening statement re-characterized the “common issues.” The plaintiffs acknowledged instead that there was only one material issue that was common to all the plaintiffs, the use of Benlate:
 

 Somebody I think in jury selection said, “One farm? Two farms? Five farms? But 27 farms?” That’s what you’re going to hear. They don’t have anything else in common. They’re in different levels of the country. They have different practices. They have different employees. They even had different sources for their rhizomes, although they were all treated with Benlate. They have different rainfall. Different insect problems from time to time. Different fungus problems from time to time.
 

 What is the one thing they have in common? The proof is going to be Benlate. That’s the chain that links every one of these people that you see in the courtroom today.
 

 The evidence presented at trial substantiated the many differences that existed among the individual plaintiffs. For example, of the twenty-seven plaintiffs, fourteen
 
 *982
 
 applied Benlate to their ferns, ten did not, and there was conflicting evidence regarding the remaining three. Those plaintiffs who did apply Benlate had differences in the concentrations used, as well as in the application methods used. Some of the growers, like Follajes Las Trojas, applied Benlate as a drench and dip to rhizomes. Other plaintiffs, like Super Heléchos, additionally sprayed the rhizomes. Still others, like Inversiones Bosqueña and Flores del Caribe, also sprayed Benlate on their plants. One plaintiff, Jardín Botánico, did not provide competent evidence that Ben-late had been applied to its rhizomes. Jurors considering the claims of plaintiffs who either never used Benlate or used it after 1991 heard evidence of Du Pont’s subsequent remedial measures.
 

 Various plaintiffs used numerous chemicals in diverse ways. In addition to Ben-late, some plaintiffs, like Rio de Janeiro, Follajes Las Trojas, Inversiones Bosque-ña, and L.L. Ornamentales, applied Man-zate, Daconil, Vydate, and dozens of other chemicals to their plants and rhizomes. Some, like Inversiones Bosqueña, Super Heléchos, and Flores y Follajes las Joyas, used other fungicides that contained beno-myl, the same active ingredient as Benlate. In fact, on cross examination, Inversiones Bosqueña testified that over the years it had used dozens of different types of fungicides in addition to possibly having used twenty or thirty chemicals on its ferns that were not listed as usable for ornamental plants by the Costa Rican Ministry of Agriculture. Inversiones Bosqueña testified that it used Benlate from 1987 to 1999 and that its practice was to keep receipts of the chemicals they bought. However, aside from producing one 1987 receipt for a minute amount of Benlate, none of the dozens of other entries regarding fungicide purchase in Inversiones Bosqueña’s records identified Benlate. Instead, Inver-siones Bosqueña’s records identified the purchases using the generic term “beno-myl” or identified purchases made to other manufacturers of benomyl, such as Beno-creek. Euro Flores indicated it applied generic benomyl because it was available at a lesser price.
 

 The plaintiffs’ ferneries were located in different areas of Costa Rica. Some were situated in higher elevations, while others were located in lower areas. These differences in elevations resulted in ferneries that operated in different climates and different growing environments for the plants. Some plaintiffs, like Heléchos de Cuero, Inversiones Senedo, L.L. Ornamen-tales, and Inversiones Bosqueña, claimed to have a disease, which they referred to as “Mal de Sterloff,” a colloquialism named for a local fernery that had similarly experienced problems typified by the characteristic deformities in the ferns. There were also indications that among some plaintiffs, like Seminole, Expohelechos, Tico Verde, and Jardín Botánico, there were reports of problems controlling pests and fungi. Still other ferneries, like L.L. Ornamentales, Plantas Reales, and Super Heléchos, presented issues regarding hurricane damage, flooding, poor sunlight, or poor farm management, such as overhar-vesting and inadequate drainage.
 

 Of the fourteen plaintiffs that used Ben-late, some, like Rio de Janeiro, Follajes de Sarchi, Plantas Tropicales de los Cabu-yales, Follajes las Trojas and Heléchos del Irazu, claimed that the damage symptoms appeared immediately. At other ferneries, like Euro Flores, Eurofern, Tico Heléchos de Poas, Heléchos Marme, and Heléchos de Cuero, the symptoms plaintiffs attribute to Benlate damage did not appear for years. Another factor that differed among the plaintiffs was the years in which they claimed to have suffered the Benlate damages. These periods ranged from twenty years prior to trial, as in L.L. Ornamen-
 
 *983
 
 tales’ case, which claimed to have suffered damages to its plants starting in 1986, to six years prior to trial, as in Desarrollos Mundiales’ case, which claimed to have suffered damages starting in 1999. Additionally, at the time of trial, some of the plaintiffs were still in the fern business, while others had closed. The evidence of ongoing operations conflicted for yet other plaintiffs, like Empresas Cavendish, Super Heléchos, and Plantas Reales.
 

 Du Pont filed a motion in limine to exclude evidence of Du Pont’s 2001 withdrawal of Benlate from the market, a Ben-late WP label change, as well as the 1991 recall of Benlate DF. The trial court denied the motion.
 

 After an eight-week trial during which the parties introduced considerable evidence that alleged disparate material facts among the twenty-seven individual plaintiffs, the jury deliberated for five days. The jury found against Du Pont on negligence and awarded each of the twenty-seven consolidated plaintiffs identical awards. The jury awarded every plaintiff the same percentage, sixty percent (60%), of the past damages claimed for both lost profits and tax benefits and denied the plaintiffs all future damages, including the costs of remediation, as well as their lost profits during the remediation process. The plaintiffs did not object to the verdict before the jury was discharged.
 

 C. The Application of the Statute of Limitations Period
 

 In what is a case of first impression for a Florida court, the trial court interpreted the Spanish term “demandable” under Costa Rican law. This issue involved the determination of when time begins to run under Costa Rican law. The trial court applied a “known or should have known” standard to the ten-year statute of limitations term that is prescribed by Costa Rican law. As a result of this determination, the trial court granted Du Pont’s post-trial Motion for Judgment in Accordance with Motion for Directed Verdict against seven of the twenty-seven plaintiffs, on statute of limitations grounds, and entered judgment against Du Pont for the remaining twenty plaintiffs.
 

 D. Other Claims on Appeal
 

 Du Pont claims that the trial court committed several instances of reversible error. One such instance involves the trial court’s decision to allow the plaintiffs to try the case on a theory that was not pled and further was not disclosed until a deposition just two months prior to the start of trial. As previously mentioned, plaintiffs’ 2001 complaints proffered two detailed theories alleging that their plants had been damaged by Du Pont because: (1) the Benlate was contaminated, and (2) Benlate DF broke down into DBU. Under the DBU theory, the plaintiffs claimed that Benlate DF was exposed to heat and moisture, which caused the benomyl in Benlate DF to produce two molecules “MBC” and “BIC.” The plaintiffs claimed that when the BIC molecule is exposed to heat and moisture, butylamine is formed. Butyla-mine then bonds with BIC molecules remaining in the product to form dibutylurea (DBU). The plaintiffs alleged that DBU acted as an herbicide to damage plants. In addition, the plaintiffs claimed that the DBU increased as the Benlate DF aged and that Benlate’s exposure to hot and humid climates, such as in Costa Rica, accelerated the breakdown process.
 

 At trial in 2006, over Du Pont’s objections, the plaintiffs argued that Benlate was defectively designed because it had “dangerous non-target effects on micro organisms” such that it “triggers an opportunistic bacterial infection.” The plaintiffs’ theory alleged that the bacterial infection
 
 *984
 
 had occurred in the fern rhizomes and that these rhizomes had been infected in Florida, the Costa Rican growers’ rhizome source. The plaintiffs claimed that this infection happened long before the plaintiffs purchased the fern rhizomes and moved them to Costa Rica to develop their ferneries. The plaintiffs’ expert concluded that “the disease had been there since the beginning of fern use in Costa Rica and the beginning of Benlate use in Costa Rica” and that the ferns were “dead on arrival” when they were purchased by the Costa Rican growers because of their exposure to Benlate treatments by the Florida growers. During the period described in the expert’s testimony, Benlate WP, and not Benlate DF, was the fungicide sold by Du Pont.
 

 Before trial, both sides conducted discovery and deposed experts regarding Du Pont’s disputed defense that the actual cause of the plaintiffs’ fern deformities was that the ferns were infected with viruses. Du Pont claimed that during Dr. Joseph Kloepper’s deposition, less than two months before the trial, Du Pont learned that the plaintiffs intended to try their cases on the “new” microbe shift theory that alleged the adverse effect of Benlate on microbes inside the leatherleaf plants. Dr. Kloepper was the plaintiffs’ expert plant pathologist and microbiologist. However, the plaintiffs had never disclosed that Dr. Kloepper would testify in opposition to Du Pont’s virus defense. At his deposition, Dr. Kloepper indicated that he had not done virus testing or analysis and that he did not know whether viruses had harmed plaintiffs’ ferneries. Dr. Kloepper also indicated that he had arrived at his conclusions concerning the microbe theory just days before his deposition.
 

 Du Pont claimed that the revelation of the new theory was made only one month before trial. Du Pont requested a ninety-day continuance in order to prepare for plaintiffs’ new theory. The trial court denied Du Pont’s request. The trial court did, however, allow a thirty-day continuance, for the limited purpose of allowing the parties to resolve an unrelated issue. The trial court subsequently ruled that no further continuances would be permitted.
 

 During the plaintiffs’ case in chief and over Du Pont’s objection, Dr. Kloepper testified that he now had a “different” opinion than proffered at his deposition. He testified that “there is no virus,” and that viruses did not cause plaintiffs’ damages. Dr. Kloepper’s trial testimony contradicted his deposition testimony that he would not offer any virus-causation opinions and that he did not plan any post-deposition work. On cross-examination, he admitted that his trial opinions were different than those of his deposition because he had “done more since then.”
 

 Du Pont also claims that the plaintiffs’ microbe theory fails under Florida’s economic loss rule. Du Pont argued that the Florida economic loss rule bars the claims because the product the plaintiffs purchased, rhizomes previously treated with Benlate, caused injury only to itself but did not damage other property., Du Pont argues that under the microbe theory, the Costa Rican growers may have a contract action against the rhizome supplier but not a tort action against Du Pont. Du Pont further contends that the trial court accepted the plaintiffs’ submission for notice of the application of foreign law months after the deadline. The trial court allowed plaintiffs to introduce-additional proof of foreign law during the trial and also after the trial, when the case had already gone to the jury.
 

 Over Du Pont’s objection, the trial court allowed the testimony of electron microscope expert Dr. Kyung Soo Kim, despite having issued a pretrial order that limited
 
 *985
 
 Dr. Kim’s testimony to rebuttal of Du Pont’s electron microscope expert, Dr. Hanson. Du Pont did not call Dr. Hanson at trial. Consequently, Dr. Kim could not rebut Dr. Hanson’s testimony. Dr. Kim testified about the light microscope technique, a technique for detecting viruses, and about electron microscope slides. Dr. Kim’s testimony included Dr. Hanson’s electron microscope slides, which were not in evidence, as well as the work by the plaintiffs’ disclosed virus experts, Ethel Sanchez and Dr. Gerardo Martinez, who were not called to testify. At Dr. Kim’s deposition, he testified that he had not heard of Ethel Sanchez and that he had not reviewed Dr. Martinez’s report.
 

 Also over Du Pont’s objection, the trial court allowed extensive evidence of previous Benlate claims brought against Du Pont by thousands of other growers. The trial court’s rationale for allowing this into evidence was that it demonstrated that Du Pont had notice. However, plaintiffs were not required to demonstrate that those thousands of claims were substantially similar to their claims. In a handful of instances where the plaintiffs did attempt to ascertain that the prior claims were substantially similar, the trial court allowed the plaintiffs to make these arguments in front of the jury. This process resulted in the growers from the prior claims, non-parties in the present case, becoming an important feature of the trial.
 

 These non-parties testified for days about how Benlate had allegedly destroyed their crops. The first two witnesses at trial, growers who brought Benlate claims against Du Pont in 1992, did not focus on the notice aspect that their claims provided Du Pont, but instead argued causation. Over Du Pont’s objections, they testified in detail about how Benlate allegedly ruined their healthy Florida ferneries. The plaintiffs were also allowed to enter photos into evidence of the alleged damage sustained by the non-parties. The plaintiffs’ counsel admitted that this prior claims evidence was being presented to the jury as proof of causation.
 

 Using the prior notice rationale, the trial court also allowed the admission into evidence of Du Pont’s settlement of claims in other Benlate cases. The plaintiffs exhibited documents and testimony in their opening statement that indicated that Du Pont accepted fault in its payment of these settlements.
 

 II.
 
 Issues on Appeal and on Cross-Appeal
 

 On direct appeal, the plaintiffs raise numerous issues. Among these issues, the plaintiffs contend that the trial court’s ruling on Du Pont’s statute of limitations defense should be reversed. As such, they claim that the trial court erred in setting aside the jury’s verdicts for the seven plaintiffs and in entering a directed verdict for Du Pont with regard to these seven plaintiffs.
 

 On cross-appeal, Du Pont argues that the trial court denied Du Pont a fair trial by improperly consolidating plaintiffs’ twenty-seven disparate claims. Du Pont contends that a new trial is required because irrelevant Benlate claims made by other growers dominated the trial and were erroneously used to prove causation. Du Pont contends that the plaintiffs’ introduction of settlements of other Benlate cases mandates reversal. In addition, Du Pont alleges that the trial courts’ admission of undisclosed opinions of plaintiffs’ experts on key issues requires reversal. Du Pont claims that the plaintiffs’ damages awards are fatally flawed. Du Pont contends that the plaintiffs’ failure to plead their “microbe shift” liability theory bars recovery. Du Pont further argues that the trial court committed reversible error
 
 *986
 
 when it gave a “consumer expectation” jury instruction.
 

 We note that there are issues raised by the parties on direct appeal and cross-appeal which we do not specifically address. We decline to do so.
 

 III.
 
 Legal Analysis
 

 A. The Consolidation Issue
 

 We first examine Du Pont’s consolidation issue raised on cross-appeal. Du Pont argues that the trial court abused its discretion in consolidating the individual claims brought by the twenty-seven plaintiffs against Du Pont. We agree with Du Pont that the trial court erred when it consolidated the individual claims brought by the twenty-seven plaintiffs against Du Pont. Therefore, we reverse and remand for new, separate trials.
 

 In
 
 State Farm Fla. Ins. Co. v. Bonham,
 
 886 So.2d 1072 (Fla. 5th DCA 2004), the Fifth District Court of Appeal provided guidance regarding Florida Rule of Civil Procedure 1.270(a) by outlining five conditions to consider in determining whether the consolidation or the separation of trials is proper. In
 
 State Farm,
 
 the district court held:
 

 In deciding whether to consolidate cases, a trial court must consider: (1) whether the trial process will be accelerated due to the consolidation; (2) whether unnecessary costs and delays can be avoided by consolidation; (3) whether there is the possibility for inconsistent verdicts; (4) whether consolidation would eliminate duplicative trials that involve substantially the same core of operative facts and questions of law; and (5) whether consolidation would deprive a party of a substantive right.
 

 Id.
 
 at 1075.
 

 In the present case, neither the plaintiffs nor Du Pont dispute that the consolidation of the twenty-seven cases satisfied the first three conditions. Du Pont instead challenges the trial court’s determination that conditions (4) and (5) were likewise satisfied and consolidation was proper.
 

 Du Pont claims that facts and questions of law, common to these plaintiffs, did not predominate when balanced against the disparate material facts and questions of law that impacted the individual ferneries. Du Pont asserts that the court abused its discretion with regards to condition (4) and therefore, the consolidation of the twenty-seven claims was improper.
 

 The record shows that the claims brought by the twenty-seven plaintiffs, several of which are related entities with common ownership or management, did share some common facts. Among them are: the plaintiffs were all growers of a common crop, leatherleaf fern; the plaintiffs were located in the same country, Costa Rica; the plaintiffs marketed their leatherleaf ferns to common buyers; and all the plaintiffs alleged that a common defendant, Du Pont, damaged their crops with its Benlate product. The record also demonstrates that the trial court relied on these commonalities in making its decision to consolidate the twenty-seven claims into the present case. However, the record likewise demonstrates that these common issues did not predominate at trial. As plaintiffs’ candid opening remark confirmed, other than Benlate, the plaintiffs “don’t have anything else in common.”
 

 At trial, the plaintiffs argued a theory that the ferns were “dead on arrival” to their Costa Rican ferneries. They alleged that the rhizomes used to grow those ferns had been damaged by the rhizome providers before they were sold to the Costa Rican growers, a result of exposure to Benlate treatments in Florida. At trial, the evidence presented showed that the
 
 *987
 
 symptoms of Benlate damage manifested at different times at different individual ferneries. Illustrative of the disparate experiences: fourteen ferneries claimed that the damage appeared immediately while others claimed that the symptoms did not appear for years.
 

 Du Pont’s defense theorized that any damage the ferns sustained was the result of alternative causes, each unique and distinctively affecting individual ferneries. In the alternative, Du Pont alleged that disparate material facts, such as the mitigation practices of the twenty-seven individual plaintiffs, accounted for dissimilar damage to the ferns. Among the disparate material facts presented, Du Pont provided evidence that the plaintiffs’ fer-neries were located in different areas of Costa Rica and were situated at different elevations, resulting in different climates and growing environments for the plants. The ferneries also experienced distinctive problems controlling pests and fungus and were subject to unique issues regarding hurricane damage, flooding, poor sunlight, overharvesting and inadequate drainage. Additionally, not all of the plaintiffs alleged having used Benlate at their ferner-ies and, at the time of trial, some of the plaintiffs were still in the fern business while others had closed, distinctly affecting the amount of damages each fernery could recover. Also of significance when considering Costa Rica’s statute of limitations, a significant disparity existed with regards to the number of years plaintiffs claim to have suffered Benlate damages. One grower claimed to have suffered damage to its plants twenty years prior to trial, while another claimed damages only six years prior to trial.
 

 The plaintiffs do not dispute the existence of facts unique to individual ferner-ies. In fact, the plaintiffs conceded during opening statement that the ferneries had different practices, employees, rhizome sources, rainfall, insect problems, fungus problems, and that the ferneries were subject to different climates. On appeal, the plaintiffs argue that despite the numerous differences articulated and entered into evidence regarding the twenty-seven ferner-ies, it is the same core of operative facts and questions of law that predominate and, thus, consolidation of the twenty-seven claims was proper. We find this argument unpersuasive.
 

 Florida Courts have noted that Florida Rule of Civil Procedure 1.270(a) essentially “duplicates” federal rule 42(a).
 
 See Wagner v. Nova Univ.,
 
 897 So.2d 375, 377 (Fla. 4th DCA 1981).
 
 See also Higley S., Inc. v. Park Shore Dev. Co.,
 
 494 So.2d 227, 229 (Fla. 2d DCA 1986) (distinguishing that there is no Florida Rule analogous to Federal Rule 81, but noting that “Rule 1.270 of the Florida Rules of Civil Procedure is a mirror image of federal Rule 42”). As a result, Florida courts may look to cases interpreting the federal rule for guidance.
 
 Wagner,
 
 397 So.2d at 377.
 

 In
 
 re Brooklyn Navy Yard Asbestos Litigation (Joint E. & S. Dist. Asbestos Litig.),
 
 971 F.2d 831, 853 (2d Cir.N.Y.1992), the United States Court of Appeals for the Second Circuit held:
 

 [W]e are mindful of the dangers of a streamlined trial process in which testimony must be curtailed and jurors must assimilate vast amounts of information. The systemic urge to aggregate litigation must not be allowed to trump our dedication to individual justice, and we must take care that each individual plaintiffs 0 — and defendant’s — cause not be lost in the shadow of a towering mass [of] litigation.
 

 In a similar vein, in language very applicable to our case, the Fourth District Court of Appeal stated in
 
 Friedman v. DeSoto Park N. Condo. Ass’n,
 
 678 So.2d 391, 393
 
 *988
 
 (Fla. 4th DCA 1996), “[w]e frankly do not see consolidation and a joint trial to be the most appropriate case management alternative because, although there may be a single factual question in common, the majority of the disputed facts and issues are disparate.”
 

 After five days of deliberation, the jury returned identical awards for all plaintiffs against Du Pont. Despite the introduction of extensive evidence of disparate material facts among the twenty-seven individual plaintiffs during the eight-week trial, every plaintiff was awarded the same percentage, sixty percent, of their past damages, and similarly, every plaintiff was denied all future damages.
 

 Du Pont further claims that consolidation was not proper because it was deprived of a substantive right, as consolidation of the twenty-seven claims resulted in unfair prejudice to it. Unfair prejudice as a result of consolidation is a broadly recognized principle. The Florida Supreme Court in
 
 State v. Williams,
 
 453 So.2d 824, 825 (Fla.1984), held that “even if consolidation is the ‘most practical and efficient method of processing’ a case, practicality and efficiency should not outweigh a defendant’s right to a fair trial.”
 

 Consolidated claims in circumstances such as those found in the present case, where questions affecting only certain individual plaintiffs predominate over common questions of law or fact, are likely to lead to juror confusion and unfair prejudice to defendants. As a result, they do not lend themselves to consolidated trials. Jurors confronted with a “dizzying amount of evidence,”
 
 Malcolm v. National Gypsum Co.,
 
 995 F.2d 346, 349 (2d Cir.1993), are forced to keep track of the disparate issues that uniquely affect the individual plaintiffs.
 

 Here, the jurors were asked to recall a vast assortment of unique facts for each of the twenty-seven plaintiffs. The particulars included each fernery’s previous growing history, when the various symptoms manifested, what injuries Benlate allegedly caused, and what damage could be attributed to other causes, as well as numerous other factors that uniquely impacted fern production at each individual fernery. This almost guaranteed juror confusion.
 

 In
 
 Cain v. Armstrong World Industries, 785
 
 F.Supp. 1448, 1455 (S.D.Ala.1992), the United States District Court for the Southern District of Alabama held that “confusion and prejudice is manifest in the identical damages awarded.” The verdict here, which awarded identical damages, similarly demonstrates that Du Pont was subjected to juror confusion and prejudice. Despite the diverse experiences of the twenty-seven plaintiffs, all were awarded the same exact percentage of their claimed damages. The common awards by the jury, in conjunction with the vast amount of disparate evidence presented at trial, demonstrate that the consolidation of the twenty-seven claims resulted in a hopelessly confused jury. Thus, the consolidation was thus inappropriate.
 

 By consolidating the claims, the plaintiffs introduced evidence to the jury that would not have been admissible had the cases been tried separately. Jurors who considered the claims of plaintiffs who had never used Benlate or did not use it after 1991, were allowed to hear evidence of Du Pont’s subsequent remedial measures, even though the measures were inadmissible as to those plaintiffs. This included admitting into evidence Du Pont’s 2001 withdrawal of Benlate from the market, a Benlate WP label change, and the 1991 recall of Benlate.
 

 We conclude that the operative facts of the individual plaintiffs were disparate and predominated over the common issues pre
 
 *989
 
 sented at trial. The consolidation resulted in prejudice to Du Pont. Consequently, we hold that the trial court abused its discretion in consolidating the claims brought by the twenty-seven plaintiffs against Du Pont. We thus reverse and remand these cases, with instructions that the claims be severed as individual plaintiffs in separate trials, by individual fer-nery or group of ferneries under common ownership or management.
 

 B. The Statute of Limitations Issue
 

 With deference to judicial economy and to aid the trial court on remand, we turn to the statute of limitations issue. The issue for this Court’s determination is the time during which a ten-year statute of limitations begins to run under Costa Ri-can law. This is an issue of first impression in Florida. The plaintiffs contend that the trial court’s ruling regarding the statute of limitations should be reversed and that the directed verdict granted in favor of Du Pont with regard to the seven plaintiffs should be reversed.
 

 The parties agree that the plaintiffs’ negligence claims were brought under Costa Rican law, pursuant to Article 1045 of the Costa Rican Civil Code. Article 1045 of the Costa Rican Civil Code, provided in its English translation, proffers:
 

 All who through ... negligence or imprudence, cause injury to another are obligated to repair it together with the losses.
 

 The parties also agree that the statute of limitations, applicable to plaintiffs’ claim, is the ten-year statute of limitations provided by Article 868 of the Costa Rican Civil Code. Article 868 of the Costa Rican Civil Code, provided in its English translation, provides that, “Every right and its corresponding action prescribes in ten years. This rule admits the exceptions set forth in the following articles and others established expressly by law, when particular cases require more or less time for prescription.”
 

 Article 874 of the Costa Rican Civil Code, further provides that the ten-year statute of limitations begins to run on the date that the cause of action is “exigible” or demandable. Article 874, provided in its English translation, proffers:
 

 The time limit for the prescription of actions [statute of limitations] shall begin to run from the day the action is demandable.
 

 The only disagreement between the parties with regards to an interpretation of Costa Rican law, is what is meant by “de-mandable.” Making this determination will decide when the ten-year statute of limitations provided by Article 868 is triggered and whether any of the plaintiffs’ actions were time barred.
 

 The parties submitted the declarations and affidavits of their respective experts in Costa Rican law in an effort to aid the court in resolving the “demandable” issue. Du Pont contended that “the statute of limitations term begins to run on the date the injury or damage occurred.” Conversely, the plaintiffs submitted that the ten-year term “starts at the moment that the damage and its cause become known, because it is at that time that the possibility of demand reparation emerges.” The plaintiffs argued that when a plaintiff must prove not only damages and causation but also culpability, the ten-year statute of limitations does not begin to run until the plaintiff knows that the damage was caused by the defendant’s wrongdoing.
 

 At trial, the court did not rule on this issue until the jury instruction conference near the end of the trial. When the court did decide, it crafted its own definition, not one submitted by either of the experts who had testified in support of the plaintiffs’ or
 
 *990
 
 of Du Pont’s argument. The court held that the claims became demandable and that the ten-year statute of limitations was triggered when “the plaintiffs knew, or by the exercise of due diligence, should have known, that their leatherleaf ferns were exhibiting the deformities or problems which they allege were caused by Ben-late.”
 

 A trial court’s determination of foreign law is a question of law over which an appellate court exercises plenary review.
 
 Transportes Aereos Nacionales, S.A. v. De Brenes,
 
 625 So.2d 4, 5 (Fla. 3d DCA 1993). The jury instruction given by the trial judge is a familiar one. However, it is not a decision based on an interpretation of Costa Rican law and a “[cjourt must look to foreign law as it is and not as one might believe it ought to be.”
 
 Tomran, Inc. v. Passano,
 
 391 Md. 1, 20, 891 A.2d 336 (Md.2006) (citing
 
 Carson v. National Bank of Commerce Trust and Sav.,
 
 501 F.2d 1082, 1085 (8th Cir.1974)).
 

 Policy reasons vary as to why certain claims are statutorily time barred. As the Supreme Court held in
 
 John R. Sand & Gravel Co. v. United States,
 
 552 U.S. 130, 133, 128 S.Ct. 750, 169 L.Ed.2d 591 (U.S.2008), “[s]ome statutes of limitations, however, seek not so much to protect a defendant’s case-specific interest in timeliness as to achieve a broader system-related goal.” In his Declaration, citing Costa Rica Case No. 120, First Chamber of the Supreme Court, 15:00 hours of July 29, 1992, the plaintiffs’ Costa Rican law expert Mr. Alejandro Batalla acknowledged that the purpose of “prescription” in Costa Ri-can law, or the statute of limitations, is to promote the “juridical value of legal certainty.” Mr. Batalla’s Declaration also stated that “[prescription is an institution created to protect the social order and certainty in all legal relationships.” Furthermore, Mr. Batalla’s deposition provided that prescription “tends, precisely to eliminate those situations of uncertainty caused by the passage of time within legal relationships.... It can be asserted, then, that the value protected herein by the law is the legal certainty for which reason the unexpected exercise of a right is to be avoided.... Justice cannot operate within uncertainty or unstable situations.”
 

 However, Mr. Batalla testified that the ten-year statute of limitations, provided for by Article 874, does not begin to run until the claimant learns of the cause of his damage, even if the claimant does not learn of the cause of damage for 15, 25 or 35 years. Then, once the claimant does learn of the cause, he has an additional ten years to commence an action. Under this interpretation, claimants have no duty of diligence to determine the cause of their damage. Mr. Batalla further testified that under his rationale, even if the plaintiffs learned during the 2006 trial that another product, not Benlate, was the actual cause of their plant damage, the ten-year statute of limitations would begin to run again against a new defendant, and the plaintiffs would be allowed an additional ten years (until 2016) to bring a new action against Du Pont. We find Mr. Batalla’s interpretation of when Article 868’s ten-year statute of limitations is triggered to be inconsistent with his own determination that the purpose of Costa Rica’s prescription policy is to advance legal certainty.
 

 In his Declaration dated February 28, 2006, Mr. Batalla also cited to case number 000291-F-2005, First Chamber of the Supreme Court of Justice, San Jose at 13:45 hours of May 12, 2005 (“Case No. 291”). Case number 291 is not governed by the Civil Code and so it does not involve Article 874 but is instead governed by the General Law of Public Administration which provides that “the right to claim indemnificátion from the Administration is
 
 *991
 
 four years commencing from the act that causes the liability.” Consequently, the statute of limitations applicable to violations governed by the General Law of Public Administration is four years. In comparison, the ten-year statute of limitations, provided by Article 868 and applicable to the present case, is the longest noncriminal statute of limitations under Costa Rican law.
 

 Although case number 291 is governed by a different Costa Rican code than that which governs the present case, it is nonetheless helpful as it contains specific statutory language to create a different triggering event for the statute of limitations period. When discussing case number 291 and its corresponding four year statute of limitations at his deposition Mr. Batalla, cited a second paragraph of Article 198:
 

 And it says, the second paragraph, “The right to demand indemnification against public officers, the statute of limitation will be four years beginning at the knowledge of the fact that has caused the damage.” So, you see, there we have two rules. There we have two rules different, one for the public administration and one for the public official, huh? Because the public official may be, in certain cases, according with this law, personally responsible. Okay? So here you have two situations. One that is very clear, [1] against the public administration beginning at the moment when the fact motivates the responsibility. And [2] the other one, beginning when the person knows about the fact that has caused him damage.
 

 As such, the statute added specific language to create different triggering events for the same four-year statute of limitations period, depending on whether the claim was to be commenced against either the public administration (government) or against a public official. For suits against the public administration, the statute of limitations began to run immediately from the moment damage was sustained. For suits against public officials, specific language was added to trigger the same four year statute of limitations, from the moment “the person knows about the fact that has caused him damage.” This distinction was not lost on Du Pont’s counsel who further queried Mr. Batalla:
 

 Q: So when Costa Rican laws want the statute to run when the victim has knowledge of the cause, it does so explicitly, right? Like it did there. You can read that again.
 

 A: Yes.
 

 Unlike the second paragraph of Article 198, Article 874 does not contain specific language which requires that the claimant have knowledge of the cause of the damage to start the ten-year statute of limitations period. Costa Rica is a civil-law jurisdiction. “It is axiomatic that in civil-law jurisdictions, lawmaking is exclusively the function of the legislature.”
 
 Transportes,
 
 625 So.2d at 6. The legislative code is controlling and jurisprudence is persuasive authority. If the Costa Rican legislature had intended the ten-year statute of limitations to start running only when a claimant had “knowledge of damage and cause,” it could easily have done so by adding express language to Article 874 as it did in the second paragraph of Article 198. Accordingly, the trial court did not err in giving the “knew or should have known” instruction, and we affirm the trial court’s rulings with respect to the statute of limitations.
 

 C. The Prior Claims Issue
 

 We turn next to Du Pont’s issue on cross-appeal regarding the Benlate claims made by growers other than the plaintiffs. We conclude that the trial court erred when it permitted the introduction of
 
 *992
 
 prior claims testimony as evidence. The determination of relevancy is within the discretion of the trial court.
 
 Ferradas v. State,
 
 434 So.2d 24 (Fla. 3d DCA 1983);
 
 Nelson v. State,
 
 395 So.2d 176 (Fla. 1st DCA 1980). The Fourth District Court of Appeal held in
 
 Trees v. K-Mart Corp.,
 
 467 So.2d 401, 403 (Fla. 4th DCA 1985), that “[wjhere a trial court has weighed probative value against prejudicial impact before reaching its decision to admit or exclude evidence, an appellate court will not overturn that decision absent a clear abuse of discretion.”
 

 The non-party witnesses, whose testimony the plaintiffs proposed to introduce, were growers who had brought Benlate claims against Du Pont in 1992. Consistent with section 90.105, Florida Statutes (2001), it was the plaintiffs’ burden to prove outside of the jury’s presence, substantial similarity between the claims and those in the non-parties’ suit, so as to demonstrate that such notice was relevant. We hold that the trial court erred in its decision to allow evidence as to the thousands of prior claims against Du Pont because the plaintiffs failed to establish the prerequisite that the prior claims were substantially similar to those in the instant case. Failure to lay a sufficient predicate establishing substantial similarity renders the evidence irrelevant as a matter of law.
 
 See Ford Motor Co. v. Hall-Edwards,
 
 971 So.2d 854, 860 (Fla. 3d DCA 2007).
 
 [3]
 
 The record demonstrates that the plaintiffs proffered that the only similarity between the many claims is that they involved the same product, Benlate. That is not enough to allow admission here. Evidence should not be admitted unless the product was used in circumstances that were substantially similar.
 
 See Frazier v. Otis Elevator Co.,
 
 645 So.2d 100, 101 (Fla. 3d DCA 1994).
 
 See generally Railway Express Agency, Inc. v. Fulmer,
 
 227 So.2d 870, 873 (Fla.1969).
 

 The trial court erroneously allowed the non-parties’ prior claims testimony because it believed that this testimony demonstrated notice of the alleged defect to the defendant. The trial court held that the testimony would show that “Du Pont knew there was something wrong with Benlate.” Assuming arguendo that substantial similarity had been established, which would have allowed the admission of this testimony, the evidence would still not have been admissible with regards to some of the plaintiffs. Approximately fifteen of the plaintiffs had never used Benlate. Consequently, for half of the plaintiffs, the notice introduced by the non-parties’ testimony was irrelevant and instead demonstrated another prejudicial effect of the consolidation of these claims against DuPont.
 

 As previously noted, the trial court failed to engage in the requisite analysis to establish that the prior claims were substantially similar. However, the record also demonstrates that if the court had engaged in the appropriate analysis, then the court would have determined that the cause of damages plaintiffs alleged in the instant case was not substantially similar to the alleged cause of damages in the prior Benlate claims. The 1992 claims of the non-party growers were analogous to those which the plaintiffs in the instant action originally pled in their complaints: (1) that the Benlate was cross-contaminated with other chemicals that were manufactured at the same facility, and (2) that Benlate DF broke down into DBU, which caused plant damage when sprayed on the fern crops.
 

 
 *993
 
 However, the plaintiffs argued the “microbe shift” theory, that Benlate damaged their fern crops because it “triggers an opportunistic bacterial infection” when exposed to the rhizomes, regardless of whether or not Benlate was ever exposed directly to the ferns. The plaintiffs’ expert also stated that due to the rhizomes exposure to Benlate, prior to their arrival in Costa Rica, the ferns were already “dead on arrival.” The plaintiffs’ expert testimony indicates that the alleged Benlate damage was present in the ferns “since the beginning of fern use in Costa Rica,” which began years before the 1992 claims.
 

 Dr. Kloepper, plaintiffs’ expert, indicated that he arrived at his microbe theory just a few days before his January 19, 2006 deposition. The record indicates that this communication was Du Pont’s first notice that Benlate may pose microbial damage when exposed to rhizomes. Here again, because the testimony introduced by the non-party growers involved a different use of Benlate and a different harm, we hold that the evidence introduced by the prior claims was not relevant to the present action.
 

 Pursuant to section 90.403, Florida Statutes (2001), relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice. Here, the probative value of the non-parties testimony was non-existent as it did not serve to prove notice to Du Pont. Because there was no probative value to the testimony provided by the non-party growers, our analysis here is uncomplicated. However, even when the probative value of evidence is undisputed, the trial court must still consider whether its introduction is substantially outweighed by the danger of unfair prejudice. Similar to the case of
 
 Ford Motor Company,
 
 “this evidence improperly became a feature of the trial” and was unfairly prejudicial to Du Pont.
 
 Ford Motor Co.,
 
 971 So.2d at 860. In the present case, the non-parties’ testimony was allowed to consume a significant part of the first week of trial. The plaintiffs were further allowed to enter photos into evidence of the alleged damage sustained by the non-parties to reinforce their testimony.
 

 Referring to the prior claims’ evidence, plaintiffs’ counsel initially told the trial court “[w]e don’t intend to introduce it for causation.” However, evidence of prior claims is not admissible to prove causation or to show negligence or culpability.
 
 See Lawrence v. Florida East Coast Ry. Co.,
 
 346 So.2d 1012, 1015 (Fla.1977);
 
 Ford,
 
 971 So.2d at 858;
 
 Rodriguez v. Loxahatchee Groves Water Control Mgmt. Dist.,
 
 636 So.2d 1348, 1349 (Fla. 4th DCA 1994). The non-party growers’ live testimony did go to causation. At trial, plaintiffs counsel even conceded, “[i]t’s part of my evidence on causation.” Accordingly, the use of the irrelevant prior claims to prove causation likewise requires reversal.
 

 D. The Settlements Issue
 

 The trial court allowed the plaintiffs to introduce evidence that Du Pont had accepted responsibility for and paid settlements of other Benlate claims because it believed that the settlement of other claims was admissible to show notice. We conclude that this constituted error.
 

 It is well-established that evidence demonstrating that a defendant settled other claims involving the same product .deprives the defendant of a fair trial.
 
 See
 
 § 90.408, Fla. Stat.;
 
 Ricks v. Loyola,
 
 822 So.2d 502, 508 (Fla.2002). Thus, it was error for the trial court to allow this information to be introduced.
 

 
 *994
 
 This Court has held that evidence of a defendant’s settlement with another claimant alleging liability for the same actions is “immediately and completely destructive to the possibility of a fair trial.”
 
 City of Coral Gables v. Jordan,
 
 186 So.2d 60, 62 (Fla. 3d DCA 1966). In fact, as Du Pont points out, no decision in Florida has held that settlement evidence can be used to show notice. In limited circumstances, notice can be shown through evidence of a substantially similar claim but not its settlement.
 
 Id.
 
 at 63. None of these unusual circumstances occurred here. Accordingly, the trial court erroneously ruled in this case that evidence of settlements can be used to show notice to a party that there was a problem with Benlate. This prejudicial evidence of settlements did not allow Du Pont to receive a fair trial.
 

 E. The Expert’s Opinion Issue
 

 We also conclude that the trial court reversibly erred when it allowed the introduction of an expert’s testimony. This court previously held in
 
 Gonzalez-Valdes v. State,
 
 834 So.2d 933, 935 (Fla. 3d DCA 2003), that “[decisions as to the admissibility of evidence are within the discretion of the trial court and will not be reversed absent a clear showing the trial court abused its discretion.”
 
 See White v. State,
 
 817 So.2d 799 (Fla.2002);
 
 Ray v. State,
 
 755 So.2d 604 (Fla.2000). Florida’s Supreme Court held in
 
 Canakaris v. Canakaris,
 
 382 So.2d 1197, 1203 (Fla.1980) that “[discretion ... is abused when the judicial action is arbitrary, fanciful, or unreasonable” (citation omitted). In addition, Florida courts have explained that the rules of discovery are intended to avoid surprise and “trial by ‘ambush.’”
 
 See Binger v. King Pest Control,
 
 401 So.2d 1310, 1314 (Fla.1981). In
 
 Binger,
 
 the Florida Supreme Court emphasized that the “search for truth and justice can be accomplished only when all relevant facts are before the judicial tribunal. Those relevant facts should be the determining factor rather than gamesmanship, surprise, or superior trial tactics.”
 
 Id.
 
 at 1313 (citation omitted).
 

 The trial court allowed Dr. Kyung Soo Kim, plaintiffs’ electron microscope expert, to offer surprise testimony despite having issued a pretrial order that limited Dr. Kim’s testimony to rebuttal of Du Pont’s electron microscope expert, Dr. Hanson, who was not called at trial. Further, Dr. Kim’s testimony exceeded the scope to which the trial court had limited his testimony. At his deposition, Dr. Kim testified that he had not heard of Ethel Sanchez and had not reviewed Dr. Gerardo Martinez’ reports. However, Dr. Kim’s trial testimony included work by the plaintiffs’ disclosed virus experts, Sanchez and Dr. Martinez, whom Du Pont deposed but the plaintiffs did not call.
 

 Citing section 90.403, Florida Statutes (1995), Florida’s Supreme Court held that “[t]he trial court must utilize a balancing test to determine if the probative value of this relevant evidence is outweighed by its prejudicial effect.”
 
 White,
 
 817 So.2d at 806. Because we determine that the trial court’s admission of Dr. Kim’s expert testimony was unreasonable and that the probative value of this evidence was outweighed by its prejudicial effect, we hold that the trial court abused its discretion with respect to this issue.
 

 F. The Claims Not Pled Issue
 

 Du Pont argues on cross-appeal that the plaintiffs’ failure to plead their “microbe shift” liability theory bars recovery. We cannot agree.
 

 Florida Rule of Civil Procedure 1.110(b)(2) requires that a complaint contain “a short and plain statement of the ultimate facts showing that the pleader is
 
 *995
 
 entitled to relief.” Unfortunately, the two operative complaints in this case were neither short nor plain. They were 37 and 88 pages each and contained 174 and 187 paragraphs respectively. Du Pont objects that the complaints were not long enough. Du Pont argues that the complaints should have included the specific allegation as to what caused the problem with the ferns. Du Pont relies on the Florida Supreme Court case of
 
 Arky, Freed, Stearns, Watson, Greer, Weaver & Harris, P.A. v. Bowmar Instrument Corp.,
 
 537 So.2d 561, 563 (Fla.1988). In
 
 Arky,
 
 the Florida Supreme Court stated:
 

 [LJitigants at the outset of a suit must be compelled to state their pleadings
 
 with sufficient particularity for a defense to be prepared.
 
 Our growing, complex society and diminishing resources mandate the requirement that litigants present all claims to the extent possible, at one time, and one time only,
 

 (emphasis added).
 

 Furthermore, “Florida’s pleading rule forces counsel to recognize the elements of their cause of action and determine whether they have or can develop the facts necessary to support it, which avoids a great deal of wasted expense to the litigants and unnecessary judicial effort.”
 
 Cont’l Baking Co. v. Vincent,
 
 634 So.2d 242, 244 (Fla. 5th DCA 1994). This principle is well accepted.
 
 See E.I. Du Pont De Nemours & Co. v. Desarrollo Indus. Bioacuatico S.A.,
 
 857 So.2d 925, 929 (Fla. 4th DCA 2003),
 
 Horowitz v. Laske,
 
 855 So.2d 169, 173 (Fla. 5th DCA 2003);
 
 Robbins v. Newhall,
 
 692 So.2d 947, 949 (Fla. 3d DCA 1997). If Du Pont is correct and the claim was not pled, it is then error for the trial court to allow the plaintiffs to argue the unpled issue at trial. The remedy for such an error is reversal. On remand plaintiffs are not allowed to amend their unpled claims to argue the same theory at a new trial. The logic for this principle is based on “the interests of judicial economy and finality.”
 
 Arky,
 
 537 So.2d 561 at 562.
 

 The twenty-seven plaintiffs in the present action filed suit against Du Pont in two separate complaints. The “Euro Flores” Amended Complaint, filed on March 21, 2001, and the “Super Heléchos” Complaint, filed on October 9, 2001, contained differently numbered but identical allegations. These two suits were consolidated into the present action. After extensive discovery, the action proceeded to trial in 2006, approximately five years after the Amended “Euro Flores” Complaint was filed.
 

 The issue is whether the plaintiffs’ microbe shift theory, which they argued at trial and under which they prevailed, satisfied Florida’s pleading requirements. We conclude that the plaintiffs satisfied Florida’s pleading requirements under Florida Rule of Civil Procedure 1.110(b)(2).
 

 The microbe shift negligence claim that they argued at trial was adequately embraced within the general negligence pleadings contained in their complaints. In the Euro Flores Amended Complaint, they alleged:
 

 61.... In some eases, BENLATE caused gradual injury to plants. In many cases, plants including plaintiffs’ ferns, were damaged very slowly and in the beginning imperceptibly. The root system declined or never developed properly, and the ferns weakened to the point that they were unable to withstand their ordinary size. In addition, BEN-LATE caused leaf deformities, an inadequate and very poor root structure, and low production of leaves per hectare. The restricted growth and plant deformities rendered a high percentage of Plaintiffs’ ferns unsaleable ...
 

 103_Plaintiffs either purchased rhizomes that had been treated with BEN-LATE and planted these rhizomes in
 
 *996
 
 their ferneries, or treated existing ferns in their ferneries with BENLATE, or both.
 

 125. BENLATE, when used by Plaintiffs for its intended purpose and in the manner prescribed by DuPont, was defective. This product posed an unreasonable and unexpected threat to Plaintiffs’ property.
 

 126. The unreasonably dangerous condition of BENLATE was due to contamination, decomposition or design defect of the product, or some combination thereof. As a result of the contamination decomposition or design defect, BENLATE was not reasonably suited for its intended use.
 

 132. DuPont breached this duty [to exercise reasonable care in connection with BENLATE] and was negligent in the manner in which it developed, formulated, manufactured, promoted and sold BENLATE ... in at least the following respects:
 

 a. negligent design and formulation of the product, such that it was contaminated with one or more harmful substances, subject to decomposition, or compromised by a design defect, ...
 

 Admittedly “microbe shift” is not specifically mentioned in the general allegations of negligence contained in the Euro Flores Amended Complaint, but we do not believe that such specificity is required. For example, plaintiffs are regularly allowed to plead that “the defendant negligently operated a vehicle so as to collide with the plaintiffs vehicle and as a direct and proximate result of which the plaintiff was injured.” Under Du Pont’s argument, plaintiffs would have to plead specifically that plaintiffs collar bone was broken when it struck the steering wheel. If the evidence showed that the collar bone was actually broken when it struck the door, then that would be an unpled theory.
 

 In addition, by Du Pont’s own admission, Du Pont learned of the microbe shift theory when expert disclosures were exchanged in December 19, 2005, two months before the trial was scheduled to begin. Du Pont questioned Dr. Joseph Kloepper extensively on the subject during his deposition on January 19, 2006. Du Pont then moved for a ninety-day continuance to allow its experts to assess and consider these opinions and formulate their own opinions. At a hearing on this motion, the trial court granted a thirty-day continuance. The trial did not commence until mid-March of 2006. Moreover, Du Pont deposed plaintiffs’ expert, Dr. Harry Mills, in April 2003, and questioned him at length regarding soil microbes and his work on the microbial issues.
 

 Du Pont’s defense at trial was that the deformities in the ferns were caused by a white-fly vectored virus. Yet in its affirmative defenses, Du Pont never mentioned “white-fly” or even “virus.” Defenses are required to be pled with as much specificity as are claims.
 
 See Walker v. Walker,
 
 254 So.2d 832, 833-34 (Fla. 1st DCA 1971). We conclude that “microbe shift” and “white-fly” were both matters to be ascertained during discovery, not subjects with which to encumber the pleadings.
 

 Thus, we hold that the general allegations were sufficiently specific to permit Du Pont to prepare a defense as to the microbe shift theory.
 

 G. Erroneous “Consumer Expectation” Jury Instruction Issue
 

 We agree that the trial court committed error when it instructed the jury on the plaintiffs’ negligence claim. The negligence claim submitted to the jury alleged that Du Pont negligently designed Ben-
 
 *997
 
 late. The trial court instructed the jury that it could find Du Pont negligent only if it found Benlate defective. The trial court told the jury that it could find Benlate defective using either the “consumer expectation” or the “risk-utility/risk-benefit” tests. The jury was instructed as follows:
 

 A product is unreasonably dangerous because of its design if the product fails to perform as safely as an ordinary consumer would expect when used as intended or in a manner reasonably foreseeable by the manufacturer, or the risk of danger in the design outweighs the benefits.
 

 The court gave this instruction over Du Pont’s objection that the “consumer expectation” test could not be used as an independent basis for finding a product defective, especially in the case of a complex product like Benlate.
 

 The Restatement (Third) of Torts: Products Liability rejects the “consumer expectations” test as an independent basis for finding a design defect.
 
 See
 
 Restatement § 2, comment g. In addition, this Court has applied the Third Restatement in
 
 Kohler Co. v. Marcotte,
 
 907 So.2d 596, 598-600 (Fla. 3d DCA 2005). Accordingly, we reverse on this issue because in giving the instruction, the trial court permitted the jury to make the finding that Benlate was defective under an inappropriate test.
 

 IV.
 
 CONCLUSION
 

 We reverse the trial court’s final money judgments and amended final money judgments rendered upon disposition of the parties’ post-trial motions and remand to the trial court for new individual trials and for further proceedings consistent with this opinion. The trial court may choose to schedule either one fernery or one group of ferneries, under common management, as individual plaintiffs in separate trials. In addition, we affirm the directed verdicts granted in Du Pont’s favor, with respect to the following seven plaintiffs: (1) Ornamentales de la Montaña, S.A.; (2) Plantas Reales, S.A.; (3) Super Heléchos, S.A.; (4) Empresas Cavendish, S.A.; (5) EuroFlores, S.A.; (6) Heléchos del Irazu, S.A.; and (7) Inversiones Bosqueña, S.A.
 

 Reversed and remanded.
 

 [1]
 

 . Plaintiffs (collectively referred to as "plaintiffs) are the following: (1) Agrofollajes, S.A.; (2) Desarollo Mundiales, S.A.; (3) Empresas Cavendish, S.A.; (4) Euro Flores, S.A.; (5) Eurofem, S.A.; (6) Expohelechos, S.A.; (7) Flores del Caribe, S.A.; (8) Follajes Las Tro-jas, S.A.; (9) Follajes de Sarchi, S.A.; (10) Flores y Follajes Las Joyas, S.A.; (11) Heléc-hos de Centro America, S.A.; (12) Heléchos de Cuero, S.A.; (13) Heléchos de Irazu, S.A.; (14) Heléchos del Monte, S.A.; (15) Inver-siones Bosqueña, S.A.; (16) Inversiones Sene-
 
 *980
 
 do, S.A.; (17) Jardin Botánico LDL Costa Rica, S.A.; (18) L.L. Ornamentales de la Mon-taña, S.A.; (19) Plantas Reales, S.A.; (20) Plantas Tropicales Las Cabuyales, S.A.; (21) Rica Fern, S.A.; (22) Rio de Janeiro, S.A.; (23) Seminole, S.A.; (24) Super Heléchos, S.A.; (25) Tico Heléchos De Poas, S.A.; (26) Heléchos Marme, S.A.; and (27) Tico Verde, S.A.
 

 [2]
 

 . The seven plaintiffs are: (1) Ornamentales de la Montaña, S.A.; (2) Plantas Reales, S.A.; (3) Super Heléchos, S.A.; (4) Empresas Cavendish, S.A.; (5) EuroFlores, S.A.; (6) He-lechos del Irazu, S.A.; and (7) Inversiones Bosqueña, S.A.
 

 [3]
 

 . The trial court did not have the benefit of our decision in
 
 Ford Motor Company
 
 at the time during which the trial court entered the orders on appeal in this case.