937 So.2d 148 (2006)
William McCONNELL and Elizabeth McConnell, Appellants,
v.
UNION CARBIDE CORPORATION, Appellee.
No. 4D04-4329.
District Court of Appeal of Florida, Fourth District.
June 28, 2006.
Rehearing Denied October 6, 2006.
*149 James L. Ferraro and David A. Jagolinzer of Ferraro & Associates, P.A., Miami, for appellants.
Natalie S. Whiteman and Lawrie E. Demorest of Alston & Bird, LLP., Atlanta, GA, for appellee.
FARMER, J.
In this asbestosis case, plaintiffs went to trial on their strict liability, failure to warn claim. They requested that the court give the standard products liability jury instructions for failing to warn of serious risk of harm when a dangerously defective product is used as intended. See Fla. Std. Jury Inst. (Civ.) PL4-PL5 (2004) (FSJI). Defendant objected on the grounds that FSJI PL4-PL5 did not apply, contending that Florida law does not recognize a manufacturing or design defect from "uncontaminated raw" material incorporated into a manufactured product. Defendant argued that "raw" asbestos is not a product capable of being defectively manufactured or designed for products liability purposes. In agreeing with defendant, the trial court cut off any discussion of the issue and instead gave a non-standard jury instruction requested by defendant. After a verdict for defendant, plaintiffs appeal. We reverse for a new trial.
During the 1970s and 1980s, William McConnell worked as a carpenter for drywall businesses in Florida and Alabama. His job involved applying a joint compound, called "Ready-Mix," onto drywall and then sanding it after it had hardened. Ready-Mix was manufactured by Georgia-Pacific and included an ingredient called "Calidria Asbestos" which is made, marketed and sold by Union Carbide (Carbide). The facts showed that Carbide milled raw asbestos into the product used in the manufacturing of Ready-Mix. In its marketing literature for Calidria Asbestos, Carbide stated:
"Calidria Asbestos is produced by a proprietary manufacturing process that yields unusually high fiber content and more complete fiber liberation from the natural bundles. As a result, Calidria Asbestos goes up to twice as far, pound for pound, as commercial grades of asbestos containing large amount of other filler materials that have no specific desirable effects on tape joint compound properties."
The McConnells alleged that he did not knowand was never informedthat Ready-Mix contained health-hazardous asbestos. They alleged that as a consequence of sanding the Ready-Mix, he unknowingly *150 released and inhaled asbestos fibers manufactured, sold, and distributed by Carbide, which caused him to develop asbestosis. They alleged that Carbide's product was unreasonably dangerous when used as intended, that it reached him essentially unchanged, and caused him serious personal injury. They adduced evidence in support of all these allegations.
In objecting to plaintiffs' request to instruct the jury with FSJI PL4-PL5, Carbide argued that this was not a products liability case because, as it contended, "raw" asbestos was simply incapable of being defectively manufactured or designed. Agreeing with Carbide, the court summarily ended any argument in response by plaintiffs, stating rather peremptorily and without further elaboration: "This is not a defect case. This is not a products liability case." In short, the court refused to hear plaintiffs' arguments on entitlement to FSJI PL4-PL5. Instead, at Carbide's request, and over the objection of plaintiffs, the trial judge gave the following instruction:
"In order to find Union Carbide strictly liable, the Plaintiff must prove that Union Carbide sold a defective product by failing to adequately warn of a particular risk that was known or noticeable in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of sale of the product, and in light of the level of education and knowledge of the danger of Union Carbide's customers such as Georgia Pacific." [e.s.]
We must differ with the trial judge as to the nature of the issue presented here. This is a products liability case. From Carbide's own words, Calidria Asbestos was produced by its own proprietary manufacturing process and is then sold to Georgia-Pacific. In fact, as we have seen, its own marketing touted the product as being designed to go "twice as far" as other "commercial grade Asbestos." There was evidence that the intended use of Carbide's Asbestosand the Ready-Mix product into which it had been addedroutinely involves sanding the joint compound after it has been applied to drywall and permitted to harden. Its intended use thus contemplates the liberation of asbestos into the air where it can be inhaled. The fiber bundles in the asbestos are liberated by the sanding, effectively increasing the level of harmful dust ordinarily associated with asbestos. The evidence showed that Carbide's milled Calidria Asbestos product reached an ultimate user like plaintiff McConnell without any essential change affecting its deleterious properties. There was ample evidence to go to the jury on the claim of a defective product without warnings.
The dangerous propensities of asbestos are well known. We take judicial notice that Florida law outlawed the use of asbestos-based fiber materials in any public building started after September 30, 1983.[1] The danger caused by asbestos products is not unique to this case or even Florida.[2] Indeed, even if it were true that *151 the Calidria Asbestos marketed by Carbide had been in its "raw" form, that fact would be meaningless in Florida, where the statute prohibiting the product encompasses even its most elemental form.[3] It reflects the understanding that asbestos is intrinsically dangerous and can cause asbestosis, a life-threatening disease.
To be sure, Carbide's argument that the Calidria Asbestos substance it sold to Georgia-Pacific was merely "raw material" is utterly betrayed by its own marketing literature. Calidria Asbestos had an "intended design" by Carbide. A product so designed may properly be deemed "defective" within the meaning of Florida products liability law. And even if the product distributed by Carbide could be thought merely raw material, we fail to understand how its unreasonably dangerous incorporation into a product distributed commercially for use in the building trades, without required warnings, would insulate it from strict liability theory. The substance is dangerous to users whether in its "raw" form or, as here, processed into a higher commercial grade. We therefore conclude that Carbide's Calidria Asbestos is a product for products liability purposes.
In determining whether plaintiffs were entitled to have the jury instructed under FSJI PL4-PL5, we rely on and follow Force v. Ford Motor Co., 879 So.2d 103 (Fla. 5th DCA 2004). Force held that a plaintiff in strict liability action in Florida is entitled to an instruction on the "consumer expectations" test originating in section 402A, RESTATEMENT (SECOND) OF TORTS.[4]Force held:
"Under the consumer-expectation theory a product is defectively designed if the plaintiff is able to demonstrate that the product did not perform as safely as an ordinary consumer would expect when used in the intended or reasonably foreseeable manner."
Force, 879 So.2d at 106. Here, evidence showed that McConnell used the Ready-Mix on drywall in the way it was designed and intended. The product lacked any warning about the presence of asbestos. Evidence indicated that the Ready-Mix product failed to carry a warning of the dangerous health implications raised by *152 sanding the dried product and thereby inhaling asbestos fibers. Without a warning, plaintiff had no way of anticipating the presence of asbestos and had every reason to expect that the product could be safely used in the ordinary manner. Plaintiffs' theory of liability was that Carbide's Calidria Asbestos made the Ready-Mix joint compound unreasonably dangerous, and thus defective, even when used as intended, and that a warning about the health hazards of asbestos was necessary. This theory is entirely compatible with Carbide's Calidria Asbestos product. FSJI PL4-PL5 are designed to be used precisely in this circumstance.
In objecting to FSJI PL4-PL5, Carbide argued that plaintiffs had not specifically pleaded whether it was a design or a manufacturing defect that made the product defective. But it is not apparent to us why it would matter whether the defect originated specifically in its design or its manufacture or both. In Ford Motor Co. v. Hill, 404 So.2d 1049 (Fla.1981), the court quoted the following with approval:
"`It would be a strange result if we said that a manufacturer who carefully designs a product and thereafter negligently produces it should be held liable, but a manufacturer who negligently designs the product and thereafter carefully produces it pursuant to the negligent design should be relieved of liability.'"
404 So.2d at 1052 (quoting Hancock v. Paccar, Inc., 204 Neb. 468, 475, 283 N.W.2d 25, 33 (1979)). The court went on to explain:
"Moreover, some commentators agree that
[t]he policy reasons for adopting strict tort liability do not change merely because of the type of defect alleged. If a product, due to its design, is dangerous at the time of an accident, that should be sufficient to impose strict tort liability.
2 L. Frumer & M. Friedman, Products Liability § 16A(4)(f)(iv)(D) at 3B-136.2(p) (1981). Contra, Henderson, Renewed Judicial Controversy over Defective Product Design: Toward the Preservation of an Emerging Consensus, 63 Minn.L.Rev. 773 (1979).

We feel that the better rule is to apply the strict liability test to all manufactured products without distinction as to whether the defect was caused by the design or the manufacturing. If so choosing, however, a plaintiff may also proceed in negligence." [e.s.]
404 So.2d at 1052. Thus, pleading specifically that the defect in the product came from its design or, instead, its manufacture is not required to make the claim a strict liability claim under section 402A or to make FSJI PL4-PL5 applicable. Accordingly, Carbide's argumentthat FSJI PL4-PL5 was not applicable because of the failure to plead and prove whether the defect came from its design or from its manufactureis not correct.
We note the frequent admonition that the trial court is "accorded broad discretion in formulating jury instructions, and its decision should not be reversed unless the error complained of resulted in a miscarriage of justice or the instruction was reasonably calculated to confuse or mislead the jury." See, e.g., Barton Protective Servs. Inc. v. Faber, 745 So.2d 968, 974 (Fla. 4th DCA 1999) (relying on Reyka v. Halifax Hosp. Dist., 657 So.2d 967 (Fla. 5th DCA 1995)). Many appellate courts have held that a "decision to give or withhold a jury instruction is to be reviewed under the abuse of discretion standard of review." Barton, 745 So.2d at 974. But whether the jury should be instructed at all on an issue actually presents a question of law because the court has a duty to *153 instruct on the law applicable to the issues litigated. See Wransky v. Dalfo, 801 So.2d 239, 243 (Fla. 4th DCA 2001) (trial court is required to instruct jury regarding law applicable to facts in evidence); Lynch v. McGovern, 270 So.2d 770, 771 (Fla. 4th DCA 1972) ("trial court is required to instruct the jury regarding the law applicable to the facts in evidence and the law of the case."). Discretion arises only as to the content of the instruction. It would seem that a more accurate statement of the standard of review may well be that giving or refusing jury instructions is reviewed under a mixed standard of de novo and abuse of discretion.
At one time all jury instructions were non-standard, and trial judges were required to decide on content for themselves without approved forms to which they could confidently resort. That changed with the adoption of the FSJI in Florida. A rule now provides:
"The forms of Florida Standard Jury Instructions published by The Florida Bar pursuant to authority of the supreme court may be used by the trial judges of this state in charging the jury in civil actions to the extent that the forms are applicable, unless the trial judge determines that an applicable form of instruction is erroneous or inadequate. In that event the trial judge shall modify the form or give such other instruction as the judge determines necessary to accurately and sufficiently instruct the jury in the circumstances of the action. In that event the trial judge shall state on the record or in a separate order the manner in which the judge finds the standard form erroneous or inadequate and the legal basis of that finding." [e.s.]
Fla. R. Civ. P. 1.985. This rule was undoubtedly designed to limit the range of discretion in deciding on the content of jury instructions. Indeed one essential purpose in having standardized texts for jury instructions is to insure that judicial statements of the law to lay juries are uniform throughout the state, especially as to like issues on similar evidence. While the FSJI recognize a possibility that even a standard instruction might not accurately state Florida law in a given circumstance, the operating presumption should be that the standard jury instructions are accurate until a litigant makes a showing to the contrary. See Wransky, 801 So.2d at 243 (holding that standard jury instructions should be used when applicable unless erroneous or inadequate). In this sense discretion in the content of civil jury instructions has been lessened.
In Force, the court made clear:
"The party who asserts instructional error of this kind must show that: (1) the requested instruction accurately states the law applicable to the facts of the case; (2) the testimony and other evidence presented support the giving of the instruction; and (3) the instruction was necessary to resolve the issues in the case properly."
879 So.2d at 106. Force applied a mixed standard of review in the circumstanceas herewhere a party demonstrates entitlement to a standard jury instruction as a matter of law. Force, 879 So.2d at 106.
In objecting to FSJI PL4-PL5, Carbide did not make a showing that they inaccurately stated Florida law, that plaintiffs failed to produce evidence to support giving these instructions, or that giving them was not necessary to resolve the issues raised by plaintiffs in the theory of their case. As in Force, the record in this case supports plaintiffs' request for FSJI PL4-PL5 in each respect: (1) each was an accurate statement of the law; (2) there was evidence to support them; and (3) the instructions were necessary for the jury to *154 resolve the dispute. Notably, Carbide did not contend that FSJI PL4-PL5 do not accurately state Florida strict liability law, or that no evidence supports the theory, or that the instruction would confuse the jury. In essence, its sole argument was that FSJI PL4-PL5 were not applicable.
Carbide's argument was not well taken because as we have seen FSJI PL4-PL5 were specifically designed for the kind of claim on trial. It is legal error to hold that this was not a strict liability, products liability case. Plaintiffs' claims fell exactly under the theory of strict liability, to which FSJI PL4-PL5 were presumptively applicable. The error of the trial judge was compounded by his peremptory termination of discussion which prevented plaintiffs' counsel from being able to state a sufficient legal argument in response to Carbide's opposition to the FSJI PL4-PL5. That is an abuse of discretion. Because plaintiffs' proposed use of FSJI PL4-PL5 was fully supported by the record, we follow Force and hold that the court erred in refusing to give plaintiffs' requested instruction.
In place of FSJI PL4-PL5, the court gave a special, non-standard instruction prepared by Carbide containing the following:
"and in light of the level of education and knowledge of the danger of Union Carbide's customers such as Georgia Pacific."
Our decision in Union Carbide Corp. v. Kavanaugh, 879 So.2d 42, 45 (Fla. 4th DCA 2004), expressly rejected the precise legal theory underlying this phrase and makes clear that it does not correctly state the law regarding the failure of a supplier in the circumstance of Carbide to warn of an unreasonable danger in the contemplated use of its product. Paradoxically, Kavanaugh involved this identical defendant, this identical product, this identical use by a plaintiff, this identical injury, the identical theories of liability, the same underlying issues, and (finally) much the same evidence. Nor has it gone unnoticed that trial counsel for plaintiffs is the same in both cases. We rejected the very same defense underlying Carbide's special jury instruction given in the present case, and held that Carbide had failed in its duty to warn because:
"It provided Georgia-Pacific with limited information which was not communicated to the ultimate users. Because [Carbide] did not take reasonable precautions under the circumstances, its duty to warn did not stop with Georgia-Pacific, but continued to the ultimate user."
879 So.2d at 46. Carbide has failed to show here why the same holding should not apply in this case.[5]
We think it is reasonably probable that the jury was misled by the final phrase in Carbide's special instruction quoted above. Carbide's proposed instruction strongly implies that Georgia-Pacific's specific knowledge regarding the defect, rather than end users like plaintiff McConnell, was the sole focus of Florida's strict liability law. But that is not an accurate statement of the law. In Kavanaugh, we explained that Carbide:
"as a bulk supplier of asbestos had a duty to warn of the danger of its product. Section 388 of the RESTATEMENT (SECOND) OF TORTS provides that:

*155 One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
(a) knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
(b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
(c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.
RESTATEMENT (SECOND) OF TORTS § 388 (1965); see also Sowell v. Am. Cyanamid Co., 888 F.2d 802, 803-04 (11th Cir.1989).
Under the RESTATEMENT, [Carbide] is liable if it knowingly placed a dangerous product on the market, the dangerous condition of which is unnoticeable, and failed to properly warn of the dangerous condition."
879 So.2d at 44. In other words, the rule is that a supplier of a dangerous product has a general duty to warn of the danger presented.
The precise nature of the duty to warn of hidden asbestos imposed on Carbide is further explained in comment n to section 388 of the RESTATEMENT (SECOND) OF TORTS:
"the magnitude of the risk involved must be compared with the burden which would be imposed by requiring them (see § 291), and the magnitude of the risk is determined not only by the chance that some harm may result but also the serious or trivial character of the harm which is likely to result (see § 293). Since the care which must be taken always increases with the danger involved, it may be reasonable to require those who supply through others chattels which if ignorantly used involve grave risk of serious harm to those who use them . . . to take precautions to bring the information home to the users of such chattels which it would be unreasonable to demand were the chattels of a less dangerous character.

Thus, while it may be proper to permit a supplier to assume that one through whom he supplies a chattel which is only slightly dangerous will communicate the information given him to those who are to use it unless he knows that [the] other is careless, it may be improper to permit him to trust the conveyance of the necessary information of the actual character of a highly dangerous article to a third person of whose character he knows nothing. It may well be that he should take the risk that this information may not be communicated, unless he exercises reasonable care to ascertain the character of the third person, or unless from previous experience with him or from the excellence of his reputation the supplier has positive reason to believe that he is careful. In addition to this, if the danger involved in the ignorant use of a particular chattel is very great, it may be that the supplier does not exercise reasonable care in entrusting the communication of the necessary information even to a person whom he has good reason to believe to be careful. Many such articles can be made to carry their own message to the understanding of those who are likely to use them by the form in which they are put out, by the *156 container in which they are supplied, or by a label or other device, indicating with a substantial sufficiency their dangerous character. Where the danger involved in the ignorant use of their true quality is great and such means of disclosure are practicable and not unduly burdensome, it may well be that the supplier should be required to adopt them."
RESTATEMENT (SECOND) OF TORTS § 388 cmt. n (1965). As this comment explains, the nature of the duty to warn is governed by the actual character of the danger involved. If the risk is slight, the supplier may properly rely on one through whom he supplies the dangerous product. Whenas herethe risk is very great, however, the supplier of a product like Calidria Asbestos may not rely on its intermediaries to give warning. This is especially true when the burden involved in giving the warning is not unduly burdensome. There is almost no burden in imposing on Carbide the duty of contractually requiring its "learned intermediaries" (like Georgia-Pacific) to affix to the end product an indelible warning of the existence of the asbestos in it and the very serious dangers in using it without proper precautions.
The facts of this case fit exactly within the above highlighted parts of comment n. We have already noted that asbestos is highly dangerous and is by statute banned from use in public construction because of its inherent danger. Comment n makes clear that with something like undisclosed Calidria Asbestos, whose unknowing use as intended can cause serious injury where its distributor's burden in disclosing its presence is so easily and cheaply accomplished by indelible labelsa supplier in the shoes of Carbide may not reasonably rely on an intermediary, no matter how learned it might be deemed. Our decision in Kavanaugh constitutes a clear holding that the "learned intermediary" exception is not applicable to Calidria Asbestos and Ready-Mix with its hidden measure of asbestos.
There was evidence that those in the industry had not been able to find a substitute for asbestos in manufacturing joint compound products, yet warning labels were not being placed on the product. Carbide had reason to believe that whatever may be the knowledge Georgia-Pacific might have had about the serious risks of harm in using this product as intended, that knowledge was not reaching uninformed end users applying the Ready-Mix product. The evidence in this case is indistinguishable from Kavanaugh. Because Carbide's proposed instruction did not accurately state the law and may have actually misled the jury into believing that Carbide had carried its duty to warn by merely warning Georgia-Pacific, we hold that it was error to give that instruction.
Reversed for new trial.
STONE and MAY, JJ., concur.
NOTES
[1] See § 255.40, Fla. Stat. (2005) ("The use of asbestos or asbestos-based fiber materials is prohibited in any building, construction of which is commenced after September 30, 1983, which is financed with public funds or is constructed for the express purpose of being leased to any governmental entity.").
[2] See, e.g., 42 U.S.C. § 7412(b)(1) (designating asbestos as hazardous air pollutant); 40 C.F.R. § 61.01 (since March 1971 designating asbestos as known hazardous air pollutant); Jackson v. Johns-Manville Sales Corp., 727 F.2d 506, 511 (5th Cir.1984) (holding that asbestos products are dangerous because they were distributed without any warning of the unavoidable risk involved in their use); Board of Regents of Univ. of Minnesota v. Royal Ins. Co. of Am., 517 N.W.2d 888, 892 (Minn.1994) (opining that it would be a disservice to the English language to say that asbestos fibers, which are a health hazard because of their irritating effects on the human body, were not irritants); Continental Cas. Co. v. Rapid-American Corp., 80 N.Y.2d 640, 653, 593 N.Y.S.2d 966, 609 N.E.2d 506 (1993) (citing various laws and regulations categorizing asbestos as a "known carcinogenic agent," a "toxic pollutant"); Martin v. Johns-Manville Corp., 508 Pa. 154, 171, 494 A.2d 1088 (1985), rev'd on other grounds, 515 Pa. 377, 528 A.2d 947 (1987) (recognizing that asbestos products were unavoidably dangerous); Borel v. Fibreboard Paper Products Corp., 493 F.2d 1076, 1090 (5th Cir.1973), cert. den., 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (applying Texas law) (saying that an unavoidably unsafe product must not be made available to the public without disclosure of those dangers that the application of reasonable foresight would reveal).
[3] See § 255.551(2), Fla. Stat. (2005) ("`Asbestos' means the asbestiform varieties of chrysotile, crocidolite, amosite, anthophyllite, tremolite, and actinolite, but does not include bituminous resinous roofing products.").
[4] The RESTATEMENT (SECOND) OF TORTS, section 402A, was adopted as the law of Florida by the supreme court in West v. Caterpillar Tractor Co. Inc., 336 So.2d 80 (Fla.1976). The RESTATEMENT (THIRD) OF TORTS has not been adopted in Florida. See Force, 879 So.2d at 107 ("Nevertheless, the Restatement (Third) position has not been adopted by any appellate court in Florida."). We purposefully forbear from any reliance on the RESTATEMENT (THIRD) OF TORTS and its risk-benefit analysis until the supreme court has recognized it as correctly stating the law of Florida.
[5] We recognize that because the plaintiffs are different, Florida law does not permit the application of collateral estoppel. Nonetheless, it does considerable disservice to respect for law when different legal rules are applied to the same facts and issues, leading to conflicting outcomes.