On Motion for Rehearing or Certification

ROTHENBERG, J.
We deny William P. Aubin’s (“Aubin”) motion for rehearing or certification. However, to address the arguments advanced in that motion, we withdraw our former opinion, dated June 20, 2012, and substitute the following opinion in its stead.
Union Carbide Corporation (“Union Carbide”) appeals from a final judgment awarding Aubin $6,624,150 in damages on his asbestos-related, products liability claims. Because Aubin failed to present any evidence demonstrating that the defective design of SG-210 Calidria caused Au-bin’s harm, peritoneal mesothelioma, we reverse the trial court’s denial of Union Carbide’s motion for a directed verdict as to Aubin’s design defect claim. In addition, because the jury instructions given by the trial court were misleading, inconsistent with the law in the Third District, and in effect directed the verdict in favor of Aubin, we reverse and remand for a new trial as to the warning defect claim consistent with this opinion.

THE FACTS

/. Background
From October 1972 to September 1974, Aubin worked as a superintendent at his *890 father’s company, Aubin Construction. During those years, Aubin supervised the construction of a model home community known as Desoto Lakes. As part of his duties, Aubin routinely handled and was otherwise exposed to joint compounds and ceiling textures that were created and distributed by Georgia-Pacific, Kaiser Gypsum, Premix-Marbletite, and other intermediary manufacturers. One of the ingredients used in those joint compounds and ceiling textures was a product mined, processed, and sold in bulk by Union Carbide named SG-210 Calidria, a particular grade of chrysotile asbestos.[2]

II. Union Carbide’s SG-210 Calidria asbestos

Union Carbide touted SG-210 Calidria as being a highly efficient grade of asbestos. Jack Walsh, a Union Carbide sales representative, attributed SG-210’s enhanced efficiency to Union Carbide’s carefully designed asbestos processing regimen, or as Union Carbide called it, its “proprietary manufacturing process.” He testified that SG-210 asbestos was twice passed through a centrifuge in order to separate the chrysotile asbestos fibers and thereby increase the product’s effectiveness.
While short-fiber SG-210 Calidria may have been more efficient than other asbestos products, it was also found more dangerous with respect to the development of asbestosis, according to several studies proffered by Aubin. This much was acknowledged by Dr. Carl Dernehl, Union Carbide’s former toxicology expert, in a letter he wrote to Union Carbide’s medical director in 1967. In that letter, Dr. Der-nehl described a study he conducted to discern how the effects of Calidria compared to those of “standard fiber” and “long fiber” asbestos. Based on the results, Dr. Dernehl warned Union Carbide’s medical director that: “The only conclusion we can draw from this crude test is that it is possible that our [Calidria] product may be more hazardous to use than long fiber asbestos in that it may induce the disease, asbestosis, at an early time after exposure.”
Although Aubin presented studies linking SG-210 Calidria to a higher degree of danger with respect to the development of asbestosis than other types of asbestos, he failed to introduce any evidence suggesting SG-210 Calidria was more dangerous than raw chrysotile asbestos with respect to the contraction of cancer or peritoneal meso-thelioma. While there was evidence generally linking chrysotile asbestos to the contraction of mesothelioma, the only relevant evidence in the record suggests that SG-210 Calidria, and chrysotile asbestos generally, was either less dangerous than other types of asbestos with respect to the contraction of mesothelioma, incapable of causing it, or inconclusive on the issue. For instance, in 1967, Dr. I.C. Sayers, of Union Carbide’s toxicology department, prepared a report explaining that an experiment comparing the carcinogenic effects of chrysotile asbestos to those of amosite and crocidolite was underway, but not yet complete. Thus, Dr. Sayers wrote that “it is not yet known whether there are significant differences in the number of tumours produced by different types of fibres.” Later, in 1970, Dr. Dernehl wrote a report on the toxicity of Calidria asbestos, and concluded that it should be as *891 sumed that “Calidria Asbestos will behave like other asbestos” with regard to “the development of lung cancer and mesotheli-oma.” In addition, Aubin proffered the testimony of Dr. Brody, a cell biologist, who testified that while chrysotile asbestos could cause peritoneal mesothelioma, other types of asbestos were “more dangerous” and “more likely to cause the disease” than chrysotile asbestos. Finally, Union Carbide presented the testimony of Dr. Rog-gli, a pathologist at Duke University, who testified that exposure to chrysotile asbestos cannot cause peritoneal mesothelioma.
The dangers associated with SG-210 Calidria are perhaps better understood by examining its intended use. The evidence showed that Union Carbide marketed and sold SG-210 Calidria to intermediary manufacturers knowing that they would incorporate the asbestos into their joint compound and texture spray products. It was also established that Union Carbide representatives knew the joint compounds and texture sprays ultimately would be sanded and sprayed by contractors during the installation of drywall and completion of finishing work, and that such sanding and spraying would liberate the SG-210 Calid-ria fibers into the air, creating a cloud of asbestos-laden dust. And as is explained below, that is exactly what happened at Desoto Lakes.

III. The Use of SG-210 Calidria at the Desoto Lakes Construction Site, and Aubin’s Exposure to Asbestos-Laden Dust

Nelson Yoder, the drywall subcontractor for Desoto Lakes, explained that at the Desoto Lakes construction site, he administered texture sprays with a spray gun onto the walls and ceilings, and applied joint compounds to the walls. After the joint compounds were applied, all the joints and nails were sanded to eliminate imperfections in the finish work and to smoothen the surface. Yoder confirmed that the processes of sanding and spraying created what he described as a “fog” of dust, and that this dust was ever present at the Desoto Lakes construction site. Yo-der also attested to the fact that Aubin was regularly present throughout all phases of construction, and, consequently, was exposed to and inhaled the dust.
In fact, by all accounts, Aubin was an active supervisor. Aubin testified that he worked hands on with the joint compounds and texture sprays, hanging and finishing drywall, and cleaning up after the subcontractors when they finished sanding and spraying. Like Yoder, Aubin recalled that the processes of sanding and spraying generated thick “clouds” of dust that were present throughout the construction of De-soto Lakes. Aubin specifically remembered using joint compounds made by Kaiser Gypsum and Georgia-Pacific, but did not recall warnings of any kind on the containers or packages in which they were delivered.

IV. The Warnings

Union Carbide stipulated at trial that neither Union Carbide nor the intermediary manufacturers placed warnings on the joint compounds and texture sprays. Union Carbide representatives testified that Union Carbide began placing warnings on its own bags of asbestos in 1968, which read: “Warning, breathing dust may be harmful. Do not breathe dust.” Aubin challenged this proposition by offering the testimony of Howard Schutte, a Georgia-Pacific corporate representative, who stated that he did not recall such labels on Union Carbide’s bags. In 1972, the Occupational Safety and Health Administration (“OSHA”) required that all containers of raw asbestos or asbestos mixtures contain the following warning:
*892 CAUTION
Contains Asbestos Fibers
Avoid Creating Dust
Breathing Asbestos Dust May Cause
Serious Bodily Harm
Union Carbide representatives testified that pursuant to this regulation, Union Carbide began placing these warnings on their bags of asbestos in 1972.
It was also hotly contested as to whether Union Carbide otherwise adequately informed intermediary manufacturers about the dangers of asbestos. Union Carbide representatives testified that along with the OSHA warning labels, Union Carbide regularly updated its clients regarding the dangers of asbestos as such dangers came to light. Conversely, Aubin introduced evidence suggesting that Union Carbide actively downplayed and even concealed the truth about the dangers of asbestos from its clients and the public, and engaged in a “misinformation campaign.”
In any event, Union Carbide stipulated that the intermediary manufacturers did not place any warnings on their products, Union Carbide knew the intermediary manufacturers did not place any warnings on their products, and Union Carbide itself did not directly warn end-users about the dangers of asbestos. Aubin claims that because there were no warnings on these products, he was unaware of the dangers associated with the liberation of SG-210 Calidria asbestos fibers into the air, and, therefore, did not wear any respiratory masks or protective gear while exposed to the asbestos. As a consequence, for roughly two years, Aubin routinely inhaled the lethal dust.

V. The Litigation

Aubin thereafter contracted peritoneal mesothelioma, an incurable, terminal disease. Aubin attributed his contraction of mesothelioma to his exposure to asbestos, and filed a complaint in the Miami-Dade Circuit Court against numerous defendants, including Union Carbide. In his complaint, Aubin alleged claims of negligence and strict liability based on theories of design, manufacturing, and warning defects. Aubin proceeded to trial against Union Carbide alone, settling or otherwise dismissing his claims against the remaining defendants.
Relying on the component parts doctrine recognized by the Restatement (Third) of Torts: Products Liability § 5 (1997) (“the Third Restatement”), as adopted by this Court in Kohler Co. v. Marcotte, 907 So.2d 596, 598-99 (Fla. 3d DCA 2005) {“Kohler ”), Union Carbide moved for a directed verdict on Aubin’s strict liability and negligence claims. That motion was denied. At the charge conference, Union Carbide requested jury instructions regarding the Third Restatement’s component parts doctrine, and, alternatively, on the duty to warn and bulk supplier doctrines under the Restatement (Second) of Torts § 388 (1965) (“the Second Restatement”). The trial court denied Union Carbide’s requests, choosing instead to deliver the special instructions that were requested by Aubin and which were taken from language used in the Fourth District’s decision in McConnell v. Union Carbide Corp., 937 So.2d 148 (Fla. 4th DCA 2006). The instruction read: “An asbestos manufacturer, such as Union Carbide Corporation, has a duty to warn end users of an unreasonable danger in the contemplated use of its products.”
The jury found in Aubin’s favor, awarding $14 million in noneconomic damages and $191,000 in economic damages, and assessing Union Carbide’s fault at 46.25 percent. After the trial court entered judgment on the verdict, Union Carbide timely moved for judgment in accordance *893 with its motion for a directed verdict or, in the alternative, a new trial. The trial court denied the motions and amended the judgment to total $6,624,150 to reflect settlements into which Aubin had entered with other defendants. This appeal followed.
Union Carbide’s primary contention on appeal is that the trial court erred by refusing to apply the Third Restatement’s component parts doctrine, and choosing instead to rely on the Second Restatement. Further, Union Carbide argues the trial court erred in: (1) denying its motion for a directed verdict; and (2) instructing the jury that Union Carbide had a duty to warn end-users directly without also instructing the jury that Union Carbide could have discharged its duty to warn.

LEGAL ANALYSIS

Upon our careful review of the record and the controlling case law, we hold that the trial court erred in: determining that Aubin’s claims are governed by the Second Restatement rather than the Third Restatement; denying Union Carbide’s motion for a directed verdict with respect to Aubin’s design defect claim; and instructing the jury that Union Carbide had a duty to warn end-users without also instructing the jury that Union Carbide could have discharged this duty by adequately warning the intermediary manufacturers, and reasonably relying on them to warn end-users.

I. Aubin’s claims are governed by the Third Restatement.

A trial court’s determination regarding the legal standard that governs a case is reviewed de novo. Dep’t of Revenue Poynter v. Bunnell, 51 So.3d 543, 545 (Fla. 1st DCA 2010); State v. Hebert, 8 So.3d 393, 395 (Fla. 4th DCA 2009). A review of the record and the case law reveals that the trial court erred as a matter of law in determining that Aubin’s claims are governed by Sections 388 and 402 of the Second Restatement.
In Kohler, this Court adopted the component parts doctrine articulated in Section 5 of the Third Restatement as the governing law for products liability claims arising out of a defendant’s sale of a component part to a manufacturer who then incorporates the component into its own products. Kohler, 907 So.2d at 598-99. This Court’s adoption of the Third Restatement was later reaffirmed and extended in Agrofollajes, S.A. v. E.I. Du Pont De Nemours & Co., 48 So.3d 976, 997 (Fla. 3d DCA 2010), where this Court rejected the Second Restatement’s “consumer expectations” test as an independent basis for finding a design defect, determining instead that, after Kohler, the appropriate standard is the “risk-utility/risk-benefit” test articulated in Section 2 of the Third Restatement.
Despite this Court’s clear adoption of the Third Restatement and its component parts standard, the trial court, during the charge conference, determined that the Second Restatement was controlling, and cited two reasons for so concluding. First, the trial court found it instructive that in McConnell, which was decided after this Court’s decision in Kohler, the Fourth District relied on the Second Restatement when presented with a factual predicate similar to the one in this case. Second, the trial court noted that in 1976, the Florida Supreme Court adopted Section 402A of the Second Restatement in West v. Caterpillar Tractor Co., 336 So.2d 80 (Fla. 1976), and has not yet expressly adopted the Third Restatement:
The Restatement Second of Torts, Section 402-A, was adopted as the law of Florida by the Supreme Court in West versus Caterpillar. The Restatement *894 Third of Torts has not been adopted in Florida.... [And] [i]t just so happens that the case of McConnell supersedes, in terms of time, the Kohler case in the Third DCA. I leave it there.
Not surprisingly, Aubin’s argument on appeal mirrors the trial court’s rationale. Aubin contends that Kohler and the Third Restatement do not control here because “Florida’s Supreme Court has not adopted the Third Restatement, and, unless and until it does so, the Third Restatement is not the law in this State.”
We disagree with the rationale shared by the trial court and Aubin, as “[t]he decisions of the district courts of appeal represent the law of Florida unless and until they are overruled by [the Florida Supreme] Court.” Stanfill v. State, 384 So.2d 141, 143 (Fla.1980). This Court, in Kohler, adopted Sections 2 and 5 of the Third Restatement, and that decision has not been overruled by the Florida Supreme Court. Kohler, 907 So.2d at 598-99, review denied, 917 So.2d 194 (Fla. 2005). Those legal principles, therefore, are binding in this District. Accordingly, since Aubin’s claims against Union Carbide stem from Union Carbide’s sale of a component part, SG-210 Calidria, to intermediary manufacturers who incorporated the asbestos into their joint compounds and texture sprays, they are governed by the Third Restatement.

II. The trial court erred in denying Union Carbide’s motion for a directed verdict on Aubin’s design defect claim, but properly denied Union Carbide’s motion for a directed verdict on Aubin’s warning defect claim.

Union Carbide argues that when Kohler and the Third Restatement are applied, Union Carbide is entitled to judgment as a matter of law, and asks this Court to reverse the trial court’s denial of its motion for a directed verdict. As is explained below, we agree with Union Carbide that the trial court erred by denying Union Carbide’s motion for a directed verdict as to Aubin’s design defect claim, but conclude the trial court proceeded correctly in submitting the warning defect claim to the jury.
A trial court’s ruling on a motion for a directed verdict is reviewed de novo. Fasani v. Kowalski, 43 So.3d 805, 812 (Fla. 3d DCA 2010). “In reviewing a trial court’s denial of a motion for a directed verdict, this Court is required to view the evidence in the light most favorable to the nonmoving party.” Id. (citing Olsten Health Servs., Inc. v. Cody, 979 So.2d 1221, 1223 (Fla. 3d DCA 2008)). “A directed verdict is proper only when the record conclusively shows an absence of facts or inferences from facts to support a jury verdict.” Fasani, 43 So.3d at 812 (quoting Schreidell v. Shoter, 500 So.2d 228, 232 (Fla. 3d DCA 1986)). “Where evidence is conflicting, or will admit of different reasonable inferences, the issue should be submitted to the jury as a question of fact, and not passed upon by the judge as a matter of law.” Martinolich v. Golden Leaf Mgmt., Inc., 786 So.2d 613, 615 (Fla. 3d DCA 2001) (quoting Levey v. Getelman, 444 So.2d 1027, 1028 (Fla. 3d DCA 1984)).
In Kohler, this Court adopted the component parts doctrine articulated in Section 5 of the Third Restatement, which provides:
One engaged in the business of selling or otherwise distributing product components who sells or distributes a component is subject to liability for harm to persons or property caused by a product into which the component is integrated if:
*895 (a) the component is defective in itself, as defined in this Chapter,[3] and the defect causes the harm; or
(b)(1) the seller or distributor of the component substantially participates in the integration of the component into the design of the product; and
(b)(2) the integration of the component causes the product to be defective, as defined in this Chapter; and (b)(3) the defect in the product causes the harm.
Kohler, 907 So.2d at 598-99; Restatement (Third) of Torts: Products Liability § 5.
As is clear from the above passage, Kohler and Section 5 of the Third Restatement delineate two potential avenues for finding a component manufacturer liable for harm: (1) proving that the components themselves were “defective”; or (2) proving that the component manufacturers substantially participated in the integration of the components into the design of the finished products. Because the second avenue is not implicated in this case, we focus solely on the first.
The language in subsection 5(a) instructs courts to refer to the language of Chapter 1 to determine whether a product is “defective.” Accordingly, in Kohler, we relied on Section 2 of Chapter 1 of the Third Restatement in defining the circumstances under which a product is deemed “defective.” Section 2 of the Third Restatement states:
A product is defective when, at the time of sale or distribution, it contains a manufacturing defect, is defective in design, or is defective because of inadequate instructions or warnings. A product:
(a) contains a manufacturing defect when the product departs from its intended design even though all possible care was exercised in the preparation and marketing of the product;
(b) is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe;
(c) is defective because of inadequate instructions or warnings when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the instructions or warnings renders the product not reasonably safe.
Kohler, 907 So.2d at 599-600; Restatement (Third) of Torts: Products Liability § 2 (1997) (emphasis added). We need not address the possibility of a “manufacturing defect” in this opinion, as Aubin concedes that there was none in this case. That leaves only design defects and warning defects for this Court’s consideration.
A. Aubin’s design defect claim
The trial court erred in denying Union Carbide’s motion for a directed verdict with respect to Aubin’s design defect claim because Aubin failed to present any evidence suggesting that the design of SG-210 Calidria caused Aubin’s harm. Plaintiffs with asbestos-related design defect claims face three hurdles under the Third Restatement. To succeed, they must demonstrate that: (1) the product was a “designed” product rather than a raw material; (2) the product’s design was *896 “defective”; and (3) the defective design caused the plaintiffs harm.
(i) There was sufficient evidence to conclude that SG-210 Calidria was a “designed” product rather than merely a raw material.
Under the Third Restatement, “a basic raw material such as sand, gravel, or kerosene cannot be defectively designed.” Restatement (Third) of Torts: Product Liability § 5 cmt. c. Relying on this language, Union Carbide argues that, like sand, gravel, and kerosene, SG-210 Calid-ria was naturally occurring ehrysotile asbestos, a basic, raw material, and, therefore, it could not have been defectively designed. Conversely, Aubin contends that SG-210 Calidria was not merely raw ehrysotile asbestos, but the product of Union Carbide’s “proprietary manufacturing process.” Aubin argues that there was sufficient evidence presented below for the jury to determine that once raw ehrysotile asbestos emerged from the proprietary manufacturing process, it became a “designed” product for purposes of products liability law. We agree with Aubin.
The evidence established that SG-210 Calidria was ehrysotile asbestos that had been subjected to Union Carbide’s carefully designed asbestos processing regimen. During this process, the ehrysotile asbestos was placed through a centrifuge multiple times in order to separate the ehrysotile fibers and thereby increase the efficiency of the asbestos when added to water. As a direct result of this process, Union Carbide, in its marketing literature, proclaimed that “Calidria asbestos generally goes twice as far, on a pound for pound basis, as ... other commercial types used in tape joint compounds.” We conclude that this evidence was sufficient to reach the trier of fact for a determination as to whether SG-210 Calidria was “designed” within the meaning of Section 2. See McConnell, 937 So.2d at 152 (“Carbide’s argument that the Calidria Asbestos substance it sold to Georgia-Pacific was merely ‘raw material’ is utterly betrayed by its own marketing literature. Calidria Abestos had an ‘intended design’ by [Union] Carbide. A product so designed may properly be deemed ‘defective’ within the meaning of Florida products liability law.”).
(ii) There was sufficient evidence to conclude that the design of SG-210 Calidria was “defective.”
Union Carbide argues that Aubin failed to establish that the design of SG-210 Calidria was defective because Aubin did not present any evidence demonstrating that the foreseeable risks of harm posed by SG-210 Calidria could have been reduced or avoided by the adoption of a “reasonable alternative design.” Union Carbide’s argument fails because Aubin presented sufficient evidence from which a trier of fact could have determined that the design of SG-210 Calidria was “maní-festly unreasonable,” a determination that obviates the necessity for demonstrating a “reasonable alternative design."
 We note that Union Carbide is correct in pointing out that Aubin failed to present any evidence regarding a “reasonable alternative design.” As is demonstrated from the transcript of the charge conference, Aubin’s counsel did not believe such evidence was necessary because he litigated the design defect claim as if it was governed by the Second Restatement’s “consumer expectations” standard:
It’s defective by design if it does not act as a reasonable consumer would expect it to act. And that’s what the jury has to decide.
[[Image here]]
*897 Mr. Terry is under the impression that ... I’ve got to come in here with alternative designs of how they should have done it instead, and that’s not required.
As has already been established, however, the Third Restatement rejects the consumer expectations test as an independent basis for finding a product defectively designed. Restatement (Third) of Torts: Products Liability § 2 cmt. g. (“Under Subsection (b), consumer expectations do not constitute an independent standard for judging the defectiveness of product designs.”); Agrofollajes, 48 So.3d at 996-97 (rejecting the consumer expectations test as an independent basis for finding a design defect in light of this Court’s adoption of the Third Restatement in Kohler). Nevertheless, as is demonstrated below, Aubin’s failure to offer evidence regarding a reasonable alternative design did not necessarily preclude a finding of liability for a defective design.
While the plain language of subsection 2(b) requires plaintiffs with design defect claims to prove the availability of a “reasonable alternative design,” satisfying subsection 2(b) is not the exclusive means by which plaintiffs may establish liability for a defective design under the Third Restatement. Under comment e., plaintiffs may forego the demonstration of a “reasonable alternative design” by showing that the product design at issue is “manifestly unreasonable.” Restatement (Third) of Torts: Products Liability § 2 cmt. e. A product design is “manifestly unreasonable” when “the extremely high degree of danger posed by its use ... so substantially outweighs its negligible social utility that no rational, reasonable person, fully aware of the relevant facts, would choose to use ... the product.” Id.
In this case, the record is replete with evidence regarding the dangers posed by the design of SG-210 Calidria, as well as its social utility. The evidence established that the design of SG-210 Calidria improved the efficiency of the asbestos when added to water, but also increased the hazards associated with the development of asbestosis, a terminal disease. We conclude that this evidence was sufficient to reach the trier of fact for a determination as to whether the design of SG-210 Calid-ria was “manifestly unreasonable” within the meaning of Section 2.
(iii) There was no evidence, however, suggesting that SG-210 Calidria’s purported design defect caused Aubin’s harm.
Under Section 5, the last hurdle is proving that the design defect caused the plaintiffs harm. See Restatement (Third) of Torts: Products Liability § 5(a) (predicating liability on a showing that “the component is defective in itself, as defined in this Chapter, and the defect causes the harm.”) (emphasis added). This requirement reflects the understanding that “[pjroducts are not generieally defective merely because they are dangerous.” Restatement (Third) of Torts: Products Liability § 2 cmt. a.
In this case, Aubin failed to present any evidence suggesting that the defective design of SG-210 Calidria caused Aubin’s harm. While there is record evidence suggesting that the design of SG-210 Calidria caused it to be more dangerous with respect to the contraction of asbestosis than raw chrysotile asbestos, such evidence is irrelevant to Aubin’s design defect claim because Aubin did not contract asbestosis; he contracted meso-thelioma. And as was established above, Aubin failed to present any evidence suggesting that the purported design defect of SG-210 Calidria made it more dangerous than raw chrysotile asbestos with respect to the contraction of mesothelioma.
*898 It is clear, therefore, that Aubin pointed to nothing other than the dangerous propensities of basic, raw chrysotile asbestos as the source of his harm. As we have already explained, such evidence is legally insufficient under the Third Restatement because “products are not generically defective merely because they are dangerous.” Id. Accordingly, a plaintiff must demonstrate that the product’s defective design, rather than its basic, raw, and naturally occurring characteristics, caused the plaintiffs harm. See Restatement (Third) of Torts: Products Liability § 5. Because Aubin introduced no evidence demonstrating that the design of SG-210 Calidria caused it to be more dangerous than it naturally is with respect to the harm suffered by Aubin, the trial court erred in denying Union Carbide’s motion for a directed verdict pertaining to Aubin’s design defect claim.
B. Aubin’s warning defect claim
Union Carbide claims the trial court erred by denying its motion for a directed verdict regarding Aubin’s warning defect claim. We affirm because there was sufficient evidence adduced at trial to create a factual issue regarding whether, based on the foreseeable risks of harm posed by SG-210 Calidria, Union Carbide discharged its duty to warn end-users by adequately and sufficiently warning the intermediary manufacturers, and reasonably relying on them to warn the end-users.
Subsection 2(c) of the Third Restatement provides that a product:
(c) is defective because of inadequate instructions or warnings when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the instructions or warnings renders the product not reasonably safe.
Restatement (Third) of Torts: Products Liability § 2. As is clear from the plain language of subsection (c), the warning defect standard focuses on the notion of “reasonableness” for judging the adequacy of warnings, a malleable notion that is intertwined with the facts and circumstances of each case. “Whether the warning actually given was reasonable in the circumstances is to be decided by the trier of fact.” Restatement (Third) of Torts: Products Liability § 2 cmt. i. Comment i of Section 2 also assists the trier of fact by providing a non-exhaustive list of factors to guide the determination as to whether a warning was adequate in any given situation:
No easy guideline exists for courts to adopt in assessing the adequacy of product warnings and instructions. In making their assessments, courts must focus on various factors, such as content and comprehensibility, intensity of expression, and the characteristics of expected user groups.

Id.

Additionally, comment i lists a number of factors for the trier of fact to consider when determining whether a manufacturer such as Union Carbide may rely on an intermediary to warn end-users, and thereby discharge its duty to warn, or conversely, is required to warn end-users directly:
There is no general rule as to whether one supplying a product for the use of others through an intermediary has a duty to warn the ultimate product user directly or may rely on the intermediary to relay warnings. The standard is one of reasonableness in the circumstances. Among the factors to be considered are the gravity of the risks posed by the product, the likelihood that the *899 intermediary will convey the information to the ultimate user, and the feasibility and effectiveness of giving a warning directly to the user. Thus, when the purchaser of machinery is the owner of a workplace who provides the machinery to employees for their use, and there is reason to doubt that the employer will pass warnings on to employees, the seller is required to reach the employees directly with necessary instructions and warnings if doing so is reasonably feasible.
[[Image here]]
Whether the warning actually given was reasonable in the circumstances is to be decided by the trier of fact.
Id. (emphasis added).
Thus, under the Third Restatement, the determination as to whether a manufacturer like Union Carbide discharged its duty to warn end-users by adequately warning an intermediary is clearly a question reserved for the trier of fact. This is consistent with longstanding Florida law, which provides that “[t]he sufficiency and reasonableness of a manufacturer’s warnings are fact questions appropriate for the jury to decide unless such warnings are ‘accurate, clear, and unambiguous.’ ” Brito v. County of Palm Beach, 753 So.2d 109, 112 (Fla. 4th DCA 1998) (quoting Felix v. Hoffmann-LaRoche, Inc., 540 So.2d 102, 104 (Fla.1989)).
“Among the factors to be considered” by the trier of fact in determining whether a manufacturer has a duty to warn end-users directly are: (1) “the gravity of the risks posed by the product”; (2) “the likelihood that the intermediary will convey the information to the ultimate user”; and (3) “the feasibility and effectiveness of giving a warning directly to the user.” Restatement (Third) of Torts: Products Liability § 2 cmt. i. The use of the word “among” demonstrates that this list of factors is intended to be inclusive rather than exhaustive. At bottom, the “standard is one of reasonableness.” Id. Thus, depending on the facts and circumstances presented in each case, other pertinent factors may be considered when deciding whether a manufacturer has a duty to warn end-users.
For example, we find that the intermediary’s education, knowledge, expertise, and relationship with end-users bear heavily on the reasonableness of a manufacturer relying on that intermediary to relay warnings to the end-users. This calls into question whether the “learned intermediary” doctrine applies in asbestos-related products liability cases, and if so, how.
In Florida, the “learned intermediar/’ doctrine originated as a defense available to prescription drug manufacturers in failure to warn cases. See Buckner v. Allergan Pharm., Inc., 400 So.2d 820, 822 (Fla. 5th DCA 1981) (“A manufacturer of a dangerous commodity, such as a drug, does have a duty to warn but when the commodity is a prescription drug we hold that this duty to warn is fulfilled by an adequate warning given to those members of the medical community lawfully authorized to prescribe, dispense and administer prescription drugs.”) (footnote omitted). Florida courts are clear that prescription drug manufacturers may discharge their duty to warn end-users as a matter of law by adequately warning physicians regarding the hazards associated with prescription drugs. See Felix, 540 So.2d at 104 (determining that while drug companies have the duty to warn of a drug’s dangerous side effects, that duty to warn is directed to physicians rather than patients under the “learned intermediary” doctrine); see also Hoffmann-LaRoche Inc. v. Mason, 27 So.3d 75, 77 (Fla. 1st DCA 2009) (“[T]he duty of a drug manufacturer to warn of the dangers involved in the use *900 of a drug is satisfied if it gives an adequate warning to the physician who prescribes the drug”).
In Florida, a variant of the learned intermediary doctrine has been extended outside of the prescription drug context, although not as a complete defense. Instead, the intermediary’s level of education, knowledge, expertise, and relationship with the end-users is informative, but not dispositive, on the issue of whether it was reasonable for the manufacturer to rely on that intermediary to relay the warning to end-users. See Brito, 753 So.2d at 109 (quoting Felix, 540 So.2d at 104) (“Even assuming that Super Shops was a learned intermediary, we disagree that, as a matter of law, the warnings provided to Super Shops by AEW were sufficient. The sufficiency and reasonableness of a manufacturer’s warnings are fact questions appropriate for the jury to decide unless such warnings are ‘accurate, clear, and unambiguous.’ ”); see also Hayes v. Spartan Chem. Co., 622 So.2d 1352 (Fla. 2d DCA 1993) (reversing summary judgment entered in favor of the defendant and remanding for the jury to determine the adequacy of the warnings even though the Second District determined that the Clearwater Police Department was not a learned intermediary). This is entirely consistent with the Third Restatement’s position on the matter, as subsection 6(d) of the Third Restatement, which deals exclusively with prescription drugs, adopts the learned intermediary defense expressly, while Section 2 retains the “reasonableness” standard.
We specifically note that under the Second Restatement, the determination as to whether a manufacturer may rely on intermediaries to relay warnings to end-users is substantially the same as under the Third Restatement. Like the Third Restatement, Florida courts applying Section 388 of the Second Restatement have held that the determination as to whether a bulk supplier may rely on an intermediary to warn end-users is a question reserved for the trier of fact. Kavanaugh, 879 So.2d at 45 (holding that “it was for the jury to determine the adequacy of UCC’s warnings to Georgia-Pacific and whether, based on the sufficiency of the warnings given, UCC still owed Kavanaugh a duty”). Also, like the Third Restatement, comment n. of Section 388 of the Second Restatement and its “bulk supplier” doctrine focus on the “reasonableness” of the manufacturer’s reliance on the intermediary to relay the warning to end-users:
Giving to the third person through whom the chattel is supplied all the information necessary to its safe use is not in all cases sufficient to relieve the supplier from liability. It is merely a means by which this information is to be conveyed to those who are to use the chattel. The question remains whether this method gives a reasonable assurance that the information will reach those whose safety depends upon their having it.
[[Image here]]
Here, as in every case which involves the determination of the precautions which must be taken to satisfy the requirements of reasonable care, the magnitude of the risk involved must be compared with the burden which would be imposed by requiring them....
Restatement (Second) of Torts § 388 cmt. n. (emphasis added).
Additionally, Florida courts applying the Second Restatement in determining whether a bulk supplier has discharged its duty to warn end-users have relied on a list of factors that is nearly identical to those outlined in the Third Restatement:
(1) the dangerous nature of the product;
(2) the form in which the product is *901 used; (3) the intensity and form of the warnings given; (4) the burdens to be imposed by requiring warnings; and (5) the likelihood that the warnings will be adequately communicated to the foreseeable users of the product.
Kavanaugh, 879 So.2d at 45. In sum, the analysis regarding whether a manufacturer like Union Carbide may rely on an intermediary manufacturer to warn end-users is substantially the same under the Second Restatement and the Third Restatements.
As is detailed below, there was sufficient evidence presented at trial to create factual questions to be resolved by the jury regarding: whether Union Carbide warned the intermediary manufacturers; whether the alleged warnings to the intermediary manufacturers were adequate; the actual degree of dangerousness of SG-210 Calidria with respect to the contraction of mesothelioma; whether it was feasible or unduly burdensome for Union Carbide to warn end-users directly; and each intermediary manufacturer’s degree of education, knowledge, expertise, and relationship with the end-users. For example, although Union Carbide presented evidence that it regularly apprised the intermediary manufacturers of the dangers associated with asbestos by providing them with the latest scientific reports and studies, Aubin presented evidence that Union Carbide misled the intermediary manufacturers into thinking SG-210 Calidria was safe. And although Union Carbide claimed that it began placing warnings on its asbestos bags in 1968, a Georgia-Pacific representative called by Aubin testified that he did not recall such labels on Union Carbide’s bags of asbestos. Further, while Aubin challenged the adequacy of the OSHA warnings, he testified at trial that if he had seen Union Carbide’s OSHA warning, he “more than certainly” would have taken steps to protect himself from the hazards of asbestos. In addition, while Aubin presented expert testimony attributing his contraction of mesothelioma to his exposure to SG-210 Calidria, Union Carbide presented expert testimony that it was relatively unlikely, if not impossible, that Aubin contracted peritoneal mesothe-lioma from exposure to chrysotile asbestos. Lastly, although Aubin claimed that it would have been feasible for Union Carbide to warn end-users directly, or to contractually require intermediary manufacturers to warn end-users, Union Carbide offered the testimony of Jack Walsh, a Union Carbide sales representative, who testified that Union Carbide did not sell directly to consumers; claimed Union Carbide had no way of identifying the end-users; attested to the fact that Union Carbide was not involved in how the intermediary manufacturers designed, distributed, or packaged their products; and contended that Union Carbide was incapable of requiring intermediary manufacturers to place warnings on products containing Union Carbide’s asbestos. Because the evidence was conflicting, and supported different reasonable inferences, the duty to warn issue was a question of fact to be determined by the jury. Thus, the trial court properly denied Union Carbide’s motion for a directed verdict as to Aubin’s warning defect claim.

III. The trial court reversibly erred by delivering misleading jury instructions which, in effect, removed the duty to warn issue from the jury’s consideration.

While the standard of review for jury instructions is abuse of discretion, such “discretion, as with any issue of law is strictly limited by case law.” Zama v. State, 54 So.3d 1075, 1077 (Fla. 4th DCA 2011) (quoting Newman v. State, 976 So.2d 76, 78 (Fla. 4th DCA 2008)). Reversible *902 error exists where the trial court delivers an instruction that “reasonably might have misled the jury.” Citizens Prop. Ins. Corp. v. Hamilton, 43 So.3d 746, 756 (Fla. 1st DCA 2010) (quoting McPhee v. Paul Revere Life Ins. Co., 883 So.2d 364, 368 (Fla. 4th DCA 2004)).
We note that at the time the charge conference was held, no standard instructions existed regarding products liability warning defects.[4] See Fla. Std. Jury Inst. (Civ.) PL5 cmt. 2 (2010) (“Pending further development of Florida law, the committee reserved the question of whether there can be strict liability for failure to warn and, if so, what duty is imposed on the manufacturer or seller.”). The trial court therefore turned to the parties and the case law for guidance. Relying on language from McConnell, Au-bin requested, and the trial court granted, the following special instruction: “An asbestos manufacturer, such as Union Carbide Corporation, has a duty to warn end-users of an unreasonable danger in the contemplated use of its products.”
While Aubin’s requested special instruction is technically accurate, it was, standing alone, misleading because Florida law provides that this duty may be discharged by reasonable reliance on an intermediary. Recognizing that Aubin’s requested instruction was misleading, Union Carbide requested that Aubin’s special instruction be supplemented with an explanation of how the duty to warn could have been discharged by Union Carbide. The trial court rejected Union Carbide’s request, and delivered Aubin’s instruction without further explanation. This was error.
As has already been discussed, under both the Third Restatement and the Second Restatement, the determination as to whether a manufacturer like Union Carbide may rely on intermediaries to warn end-users is to be analyzed by the trier of fact, Kavanaugh, 879 So.2d at 45, and the standard to be employed is one of “reasonableness.” The Third Restatement provides several factors to guide the analysis, and these factors are substantially the same as those set forth in the Section 388 of the Second Restatement under comment n. Moreover, we have identified several additional considerations that are instructive in this analysis, including the intermediary’s level of education, knowledge, expertise, and relationship with the end-users.
The trial court, however, did not instruct the jury on any of these factors. And while the trial court did instruct the jury regarding the general negligence standard, which theoretically subsumes many of these considerations, the instruction to the jury that Union Carbide had a duty to warn end-users effectively foreclosed such considerations, and amounted to a directed verdict since Union Carbide had stipulated at trial that it had not warned end-users. Because the trial court’s instruction communicated to the jury that Union Carbide had a duty to warn end-users, but did not inform the jury that Union Carbide could have discharged its duty by adequately warning the intermediary manufacturers and reasonably relying on them to warn end-users, we conclude that the instruction given was misleading and entitles Union Carbide to a new trial.

. Union Carbide sold asbestos in bulk to intermediary manufacturers. The intermediary manufacturers then combined the asbestos with other ingredients to manufacture and sell finished products, such as joint compounds and texture sprays, to distributors, contractors, and consumers. Importantly, Union Carbide had no involvement in the packaging or distribution of the finished products.

. Section 5 is located in Chapter 1 of the Third Restatement, which is titled: "Liability Of Commercial Product Sellers Based On Product Defects At Time Of Sale.”

. As of the time this opinion was written, there were still no standard instructions on strict liability failure to warn claims.